**In re Stanley C. HEWITT and Eleanor L. Hewitt, Debtors.**

**KETCHIKAN LODGE NO. 1429, BENEVOLENT AND PROTECTIVE ORDER OF ELKS, Plaintiff,**

**v.**

**Stanley C. HEWITT and Eleanor L. Hewitt, Defendants.**

**Bankruptcy Nos. 5–81–0005, 5–81–0006.**

United States Bankruptcy Court, D. Alaska.

Feb. 9, 1982.

E. Budd Simpson, Birch, Horton, Bittner, Monroe, Pestinger & Anderson, Juneau, Alaska, for plaintiff.

Dillon E. Jackson, Keller, Jacobson, Hole, Jackson & Snodgrass, Bellevue, Wash., and Drew Peterson, Ellis Law Offices, Ketchikan, Alaska, for defendants.

## MEMORANDUM OPINION

J. DOUGLAS WILLIAMS, II, Bankruptcy Judge.

Before the Court for decision is a complaint for relief from the automatic stay of § 362 of the Bankruptcy Reform Act of 1978 (Code), 11 U.S.C. § 362, filed by Ketchikan Lodge No. 1429, Benevolent and Protective Order of Elks (Elks), and seeking leave to continue foreclosure proceedings in Alaska state court concerning the place of business of Chapter 11 Debtors Stanley and Eleanor Hewitt (Hewitts). The Elks received a judgment of foreclosure, pursuant to a deed of trust acceleration clause, in state court before the Hewitts filed their Chapter 11 petition, but no sale has been held. Also before the Court is a complaint

for forcible entry and detainer filed by the Hewitts against the Elks, demanding payment of rent arrearages and/or recovery of possession of office space leased by the Elks from the Hewitts in the same building that is the subject of the foreclosure suit. The primary legal issue in this dispute concerns whether the fact that the Elks have reduced their claim under the deed of trust to a judgment of foreclosure, although no foreclosure sale has been held, precludes the Hewitts from curing the deed of trust default and reinstating the maturity of the deed of trust note pursuant to § 1124(2) of the Code. Having heard the evidence presented at the consolidated preliminary and final hearing, having considered the arguments of the parties and having reviewed the applicable legislation, legislative history and case law, this Court finds that pursuant to § 1124(2) the claim of the Elks will not be impaired by reversal of acceleration pursuant to a plan of reorganization, that the Elks' interest in the subject property is adequately protected, and that the Hewitts are not entitled to relief pursuant to their forcible entry and detainer complaint until such time as they implement through a plan of reorganization the benefits afforded them by § 1124(2).

*Findings of Fact*

The Hewitts operate a restaurant in the Fireside Building in Ketchikan, Alaska, and also operate a commercial real estate rental business in the same building. The Hewitts purchased the Fireside property in January of 1974 with loans from various sources, one loan being from the Elks for $150,000. The Elks received in consideration a note from the Hewitts, secured by a deed of trust on the Fireside property. The deed of trust was recorded on March 26, 1974 in the Ketchikan recording district. The parties also entered into a lease agreement whereby the Elks leased office space in the Fireside Building from the Hewitts.

The Hewitts defaulted on the repayment of their note to the Elks. The deed of trust and the note contained provisions entitling the Elks to accelerate the entire note obligation in the event of any default. On July

2, 1981, the Elks obtained a judgment of foreclosure on the Fireside property pursuant to the deed of trust, in the Superior Court for the First Judicial District of Alaska. That court also made findings and rendered judgment concerning the amount due the Elks on the note as accelerated by default provisions of the note and of the deed of trust and concerning the amount of rental arrearages owed Hewitts by the Elks. Setting off the obligations, and also setting off the costs and attorneys' fees awarded each party, the state court found that the Elks were owed $149,495.21, and the foreclosure judgment was rendered for this amount.

After the rendering of the state court judgment, the parties began to negotiate regarding a delay in the foreclosure proceedings. The outcome of the negotiations was disputed at the final hearing. The negotiations did result in an agreement to postpone the foreclosure sale until July 15, 1981. This Court also finds that the parties agreed to freeze the accounting between them from July 1, 1981 through July 31, 1981, with no interest accruing to the Elks on the obligation of the Hewitts and with no rentals accruing to the Hewitts for the Elks' lease. Although the understanding of the parties was not sufficiently refined to contemplate the situation now before the Court, this Court finds that a fair interpretation of the agreement under the present facts is that the parties agreed to resume the lease arrangement at a rental of $2,399.60 per month after July 31, 1981, if the property had not been foreclosed by that time.

The filing of the Hewitts' Chapter 11 petition on July 13, 1981 halted the foreclosure sale, pursuant to § 362 of the Code. The Hewitts have not yet submitted a plan of reorganization pursuant to Chapter 11.

As of the date of filing of the Chapter 11 petition, the amount owed by the Debtors to the Elks and secured by the Fireside property was $149,495.21. Secured debts against the Fireside property senior to the interest of the Elks totaled $494,408.07 at the time the petition was filed. Interest

charges are accruing on these obligations. This Court finds that the present fair market value of the Fireside property, disputed at the hearing, is at least $1,000,000.

This Court further finds that the ownership and rental of the Fireside property by the Hewitts is necessary to an effective reorganization of the business. The totality of the facts shows that the real estate rental business is a necessary component of the Hewitts' business affairs.

On November 5, 1981, the Hewitts filed a complaint in this Court for forcible entry and detainer (FED), pursuant to Alaska Statute 09.45.070. They claim that they are entitled to possession of the premises leased by the Elks and to rental arrearages. The Elks answered, denying the Hewitts' claim and counterclaiming for damages to the Elks' right to quiet enjoyment of the leasehold, allegedly caused by harassment by the Hewitts. On November 17, 1981, the Elks filed the complaint for relief from the automatic stay of § 362, seeking leave to continue foreclosure proceedings in state court or, alternatively, for adequate protection. Pursuant to an agreement of the parties, the preliminary and final hearings on the latter complaint were consolidated, along with the trial on the FED action, and were held on December 23, 1981 in Ketchikan. At the conclusion of the trial the automatic stay was continued in effect pending this Court's ruling, pursuant to Interim Rule 4001(a) as amended by District of Alaska Bankruptcy Rule 23(J).

*Conclusions of Law*

The Elks argue that their security interest in the Fireside property is not adequately protected, and therefore they are entitled to relief from the automatic stay of § 362 of the Code. It is asserted by the Elks that the state court judgment of foreclosure entitles them to realize the entire debt owed them immediately and that this claim to immediate satisfaction must be protected. The Elks allege that the Fireside property does not provide an adequate equity cushion and that its value is deteriorating. Furthermore, the Elks contend that they are entitled to relief pursuant to § 362(d)(2)

because ownership and rental of the Fireside property is not necessary to a successful reorganization of the Hewitts' business, which, say the Elks, is limited to the restaurant business. Finally the Elks argue that they are entitled to relief "for cause" pursuant to § 362(d)(1), claiming that the Hewitts filed their Chapter 11 petition solely to halt the foreclosure proceedings and thus in bad faith.

The Hewitts respond that the Fireside property provides a sufficient equity cushion to protect the Elks' interest in the property. They argue that pursuant to § 1124(2), the Elks' claim will not be impaired if the Chapter 11 plan cures the default on the original note and deed of trust, reinstates the maturity of the note, and otherwise complies with the requirements of that section. Further, argue the Hewitts, if the acceleration of the note is reversed pursuant to § 1124(2), the Elks will be indebted to the Hewitts, as the rental arrearage of the Elks will exceed the amount past due on the unaccelerated deed of trust note. The Hewitts conclude that if the Elks' claim only entitles the Elks to receive payments at the original maturity and at the original interest rate, the Elks will clearly be protected by a curing of the default and performance pursuant to the terms of the note.

Section 1124(2) of the Code allows a debtor pursuant to a Chapter 11 plan to reverse the acceleration of an obligation caused by his default. That section reads as follows:

> *§ 1124. Impairment of claims or interests.* Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—
>
> . . . .
>
> (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—
>
>> (A) cures any such default, other than a default of a kind specified in section

365(b)(2) of this title, that occurred before or after the commencement of the case under this title;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest;

. . .

■ The question before this Court is whether § 1124(2) is applicable where a claim based on a contractual acceleration clause has been reduced to a judgment of foreclosure in state court before the filing of the debtor's Chapter 11 petition, but where foreclosure has not yet occurred. This Court holds that § 1124 does apply to allow reversal of the acceleration in such a situation. The intent of Congress as evidenced by the language of the Code and by the legislative history, the identity of basis and effect of a state court judgment and the operation of a contractual acceleration clause, and the bankruptcy court's power and duty to look behind state court judgments in order to implement the policies promulgated by Congress, require the application of § 1124(2) to this situation.

The broad language by which Congress declared in the Code that holders of claims are not impaired by reversal of acceleration indicates an intent that § 1124(2) encompasses claims reduced to judgment. That subsection explicitly negates the acceleration effect of any contractual provision or applicable law. It encompasses any default, whether occurring before or after filing of the bankruptcy petition. Moreover, the section declares that no "class of claims" is impaired by reversal of acceleration, and "claim" is defined in § 101(4) to include any "right to payment, whether or not such right is reduced to judgment. . . ." Taken together these sections evince a Congressional intent to apply the remedy of § 1124(2) to obligations regardless of whether or not they have been reduced to judgment.

More significantly, the reasons by which Congress has explained the enactment of § 1124(2) apply equally as well to situations where the accelerated claim has been reduced to a judgment of foreclosure as to situations where no judgment has been obtained. As the Senate has stated:

[A] claim or interest is unimpaired by curing the effect of a default and reinstating the original terms of an obligation when maturity was brought on or accelerated by the default. The intervention of bankruptcy and the defaults represent a temporary crisis which the plan of reorganization is intended to clear away. The holder of a claim or interest who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain. Curing of the default and the assumption of the debt in accordance with its terms is an important reorganization technique for dealing with a particular class of claims, especially secured claims.

Senate Report No. 95–989, 95th Cong., 2d Sess. 120 (1978), U.S.Code Cong. & Admin. News 1978, p. 5787, 5906. The secured creditor is no more harmed by the reversal of acceleration, and thus has as little cause to complain, where a state court has simply applied the contractual provision or applicable law requiring acceleration and has embodied this application in a judgment of foreclosure. The Congressional policy to relieve Chapter 11 debtors of the burdens of acceleration clauses should not be thwarted by the formal obtaining of a judgment.

The reading of § 1124(2) to allow the bankruptcy court to look behind the state court judgment to the nature of the claim on which the judgment was rendered accords with the duties of the Court and the intent of Congress that have been found in similar situations in bankruptcy law. In *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238,

84 L.Ed. 281 (1939), the Court held that for purposes of determining whether a claim should be allowed against the debtor's estate, the bankruptcy court must look behind a state court judgment to examine the original claim. In describing the bankruptcy court's power and duty when faced with a claim embodied in a state court judgment, the Court stated:

> [T]his Court has held that a bankruptcy court has full power to inquire into the validity of any claim asserted against the estate and to disallow it if it is ascertained to be without lawful existence. (citation omitted). And the mere fact that the claim has been reduced to judgment does not prevent such an inquiry. As the merger of a claim into a judgment does not change its nature so far as provability is concerned, (citation omitted), so the Court may look behind the judgment to determine the essential nature of the liability for purposes of proof and allowance. . . .

Id., 308 U.S. at 305–306, 60 S.Ct. at 244. In Brown v. Felsen, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979), the Court held that for purposes of determining the dischargeability of a debt allegedly the product of fraud or deceit on the part of the bankrupt, a determination intended by Congress to be a matter of federal law, the bankruptcy court should look behind a state court judgment and not apply res judicata. In the present case, as in those cited, the debtors seek not to dispute the validity of the state court judgment, but to have the policies embodied in the Bankruptcy Code applied to their situation, a task which the state court was necessarily unable to undertake. This Court should look behind the state court judgment to the nature of the claim on which it was rendered.

Although this Court has been unable to discover prior judicial decisions on the applicability of § 1124(2) to accelerations reduced to judgment, dicta in cases interpreting § 1322(b)(5) of the Code support this Court's reading of § 1124(2). Section 1322(b)(5) enables a Chapter 13 debtor to cure a default on a long-term residential mortgage. That section is less broad than is § 1124(2), in that it does not explicitly authorize reversal of acceleration and in that it limits its application to debts which fully mature after the completion of the debtor's plan.[1] Although the courts interpreting § 1322(b)(5) have split concerning whether that section authorizes the curing of a default after a judgment of foreclosure, at least one of those courts has declared that the broader language of § 1124(2) would allow the application of § 1124 where a judgment of foreclosure had been rendered, In re Taddeo, 9 B.R. 299, 302–303, 7 B.C.D. 422, 4 C.B.C.2d 185, CCH Bankr.L.Rptr. ¶ 68093 (Bkrtcy.E.D.N. Y.), aff'd, 15 B.R. 273 (E.D.N.Y.1981); and another court has implied this result, In re Canady, 9 B.R. 428, 430, 7 B.C.D. 749, 4 C.B.C.2d 113, CCH Bankr.L.Rptr. ¶ 67906 (Bkrtcy.D.Conn.1981).

A final reason supporting the application of § 1124(2) to accelerations reduced to judgments of foreclosure concerns the lack of practical finality which such judgments possess in Alaska, as in many states, and the number of rights that a mortgagor retains after judgment of foreclosure. In Alaska, a mortgagor can terminate a judgment of foreclosure rendered against him by paying the amount of the judgment before sale. AS 09.45.220.[2] Even after sale

---

1. Section 1322(b) reads, in pertinent part:
   (b) Subject to subsections (a) and (c) of this section, the plan may—
   . . . .
   (2) Modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims;

   .    .    .    .    .

   (5) notwithstanding paragraph (2) of this subsection, provide for the curing of any de-

fault within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due;
. . . .

2. AS 09.45.220, Effect of payment before judgment or sale, states:
   If, before a judgment is given, the amount then due, with the costs of action, is brought into court and paid to the clerk, the action

and confirmation occur, the mortgagor can redeem for a one year period. AS 09.35.-220, 09.35.250, 09.45.190.[3] The buyer at a foreclosure sale is not entitled to conveyance until after the mortgagor's redemption period has expired, the mortgagor's original estate being restorable until that time. AS 09.35.260.[4] Since application of the Congressional policy of § 1124(2) will not further add to the uncertainties of the state system, particularly where, as here, no foreclosure sale has been held, the policy should be given effect.

■ Since this Court has determined that it was the intent of Congress in § 1124(2) to allow reversal of acceleration and restoration of the original maturity of the secured party's claim even after a judgment of foreclosure, this Court must next determine whether such action was within the power of Congress. The power given to Congress by Article I, section 8, clause 4 of the United States Constitution to establish uniform bankruptcy laws is plenary. Pursuant to this power Congress can alter the rights of secured creditors. *Wright v. Vinton Branch of the Mountain Trust Bank of Roanoake*, 300 U.S. 440, 470, 57 S.Ct. 556, 81 L.Ed. 736 (1937); *Wright v. Union Central Life Ins. Co.*, 304 U.S. 502, 515–518, 58 S.Ct. 1025, 1032–1034, 82 L.Ed. 1490 (1938). The rights of a secured creditor with a perfected interest are property, protected by the Fifth Amendment. *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589, 55 S.Ct. 854, 863, 79 L.Ed. 1593 (1935). But these rights are subject to reasonable modification pursuant to the bankruptcy power of Congress. *Wright v. Vinton Branch, supra*, 300 U.S. at 470; *Hanover National Bank v. Moyses*, 186 U.S. 181, 192, 22 S.Ct. 857, 862, 46 L.Ed. 1113 (1902).

■ Application of the federal decisions to the instant case makes clear that the modification of the secured creditor's interest effected by § 1124(2), reversing of acceleration and the consequent postponement of the creditor's right to sell the collateral in foreclosure, does not unreasonably deprive the secured creditor of property rights. The secured creditor retains his original lien after the operation of § 1124(2), and he will still be able to satisfy the debt owed him through the collateral should the debtor fail to adhere to the terms of the original agreement. The section requires that the secured party receive the benefit of his original bargain, that he be compensated for any damages suffered in reliance on the acceleration provision, and that his property rights not be altered

shall be dismissed, and, if the same be done after judgment and before sale, the effect of the judgment as to the amount then due and paid shall be terminated and the execution, if any have issued, be recalled by the clerk. When an installment not due is adjudged to be paid, the court shall determine and specify in the judgment what sum shall be received in satisfaction thereof, which sum may be equal to the installment or otherwise, according to the present value thereof.

3. AS 09.35.220, Redemption, reads in pertinent part:

Property sold subject to redemption or any part separately sold may be redeemed by the following persons or their successors in interest:

(1) the judgment debtor . . . ,

. . . .

AS 09.35.250, Redemption by judgment debtor or successor, states:

The judgment debtor or his successor in interest may redeem the property before the confirmation of sale on paying the amount of the purchase money, with interest at the rate of eight per cent a year from the date of sale,

together with the amount of any taxes, and, in the case of unpatented mining claims, the annual assessment work required to be performed by law, and expenses under § 300(b) of this chapter which the purchaser or redemptioner may have paid after the purchase. If the judgment debtor does not redeem before the confirmation of the sale, he may redeem only within 12 months from the order of confirmation.

AS 09.45.190, Redemption after foreclosure of lien, states:

Property sold upon a judgment of foreclosure may be redeemed in the manner and with the effect as real property sold on an execution issued upon a judgment for the payment of an unsecured debt.

4. AS 09.35.260, Conveyance of property, states:

If no redemption is made within the time prescribed, the purchaser or last redemptioner is entitled to a conveyance. If the judgment debtor redeems, the effect of the sale is terminated and he is restored to his estate.

in any way other than by the reversal of acceleration. In light of the benefits attained by § 1124 for the debtor and for his general creditors, the nullification of acceleration and the postponement of the secured creditor's right to proceed with foreclosure constitute a reasonable exercise of the bankruptcy power of Congress. *Compare Wright v. Vinton Branch, supra, with Louisville Joint Stock Land Bank v. Radford, supra.* Section 1124(2) does not so much impair the creditor's lien as to suspend its enforcement, thereby postponing the creditor's remedy. *Cf. Continental Illinois National Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry. Co.,* 294 U.S. 648, 680–681, 55 S.Ct. 595, 608, 79 L.Ed. 1110 (1935). As long as a secured creditor's rights are protected to the extent of the value of the property, no constitutional right has been infringed. *Wright v. Union Central Life Ins. Co.,* 311 U.S. 273, 278, 61 S.Ct. 196, 199, 85 L.Ed. 184 (1940).

█ The fact that the secured creditor has reduced his rights to judgment does not materially alter those rights in the face of the bankruptcy powers of Congress. Congress is empowered to authorize the bankruptcy courts to look behind state court judgments in order to apply the policies of Federal bankruptcy law to bankruptcy matters. *Pepper v. Litton, supra; Brown v. Felsen, supra; Board of Trade of Chicago v. Johnson,* 264 U.S. 1, 10, 44 S.Ct. 232, 234, 68 L.Ed. 533 (1924). In *Kalb v. Feuerstein,* 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940), the Court upheld the application of the Frazier-Lemke Act, 47 Stat. 1470, as amended 49 Stat. 942, § 75 of the Bankruptcy Act of 1898, where the secured creditor had received a state court judgment of foreclosure before the bankrupt filed his bankruptcy petition. Section 75, similarly to § 1124(2), postponed remedies to which the secured creditor would have been immediately entitled under his security agreement and under the judgment of foreclosure. Such legislation was found to be within the scope of the bankruptcy power of Congress.

█ Even if Congress has the power to reverse an acceleration, the Elks next argue that the Hewitts cannot avail themselves of § 1124(2) in this litigation for relief from the automatic stay, because § 1124(2) only authorizes actions that a debtor may take pursuant to a plan of reorganization. No plan has yet been submitted in the Hewitts' Chapter 11 proceeding. But the Elks' complaint for relief from stay and for adequate protection compels the Court to consider the ultimate rights of the parties, in order to determine what is the indubitable equivalent of those rights. Where it appears that pursuant to § 1124(2) the debtors will be able to cure the default and reinstate the original maturity of their debt, this Court will not require the debtors to provide the indubitable equivalent of a plaintiff's right to accelerated payments. If the Court could not consider the probable effect of § 1124(2) at this stage of the litigation, debtors would likely never reach the point where they could make use of § 1124(2) through implementation of a plan. However, this Court will order the Hewitts to submit a plan within sixty days of the date of this opinion, and the order will be without prejudice to the Elks to seek relief should the plan not propose the safeguards mandated by § 1124(2).

█ In light of the probable application of § 1124(2) and of the value of the Hewitts' property in comparison to the amount of the encumbrances on it, as set out in the findings of fact, this Court concludes that the interest of the Elks (when coupled with the application of § 1124(2)) is adequately protected by an equity cushion in excess of $300,000. The Elks are, however, free to seek further relief in the event of a material change in circumstances.

The facts further show that ownership of the Fireside property by the Hewitts is necessary to an effective reorganization. The facts show the Hewitts' business to consist of operation of both a restaurant and a commercial real estate business. The Fireside property houses both businesses and provides all the rentable real estate for the latter business. The continued owner-

ship and utilization of the entire property by the Hewitts is necessary to the successful implementation of a plan of reorganization.

■ The facts also demonstrate that the Hewitts did not file their Chapter 11 proceeding in bad faith. They were attempting to improve the operation of their business or to obtain additional financing so as to avoid the need for bankruptcy proceedings. Their filing under Chapter 11 of the Code shortly before the scheduled foreclosure sale, when other alternatives were exhausted, was an attempt to preserve their troubled but still viable business for the benefit of themselves and their creditors, the very purpose of reorganization. *See In re Huntington Ltd.*, 654 F.2d 578, 589 (9th Cir. 1981); *In re BBT*, 11 B.R. 224, 235, 7 B.C.D. 769, 775 (Bkrtcy.D.Nev.1981). The filing of the petition was not solely an attempt to halt the foreclosure sale or to delay creditors from reaching the assets, but was filed with honesty of purpose and with a reasonable hope of success. These facts indicate good faith. *See Tennessee Publishing Co. v. American National Bank*, 299 U.S. 18, 22, 57 S.Ct. 85, 87, 81 L.Ed. 13 (1936); *Provident Mutual Life Ins. Co. v. University Evangelical Lutheran Church of Seattle*, 90 F.2d 992, 995 (9th Cir. 1937).

The final issue to be decided concerns the Hewitts' action to recover possession of the office space leased to the Elks in the Fireside Building. The basis for their action is the alleged non-payment of rent by the Elks.[5] The Hewitts claim that, in light of their ability to reverse the acceleration on their debt to the Elks, the Elks are indebted to the Hewitts. They seek possession of the premises or a new lease with the Elks at increased rates.

■ This Court finds that the Hewitts are not presently entitled to demand either possession of the premises occupied by the Elks or a new lease. Pursuant to § 1124(2), the Elks are entitled to rely on the rights accruing to them pursuant to the Hewitts' default on their note, until such time as the default is cured and the acceleration is reversed pursuant to a plan of reorganization. Furthermore, § 1124(2) requires that the Elks be compensated for any damages suffered by them in reliance on the accelerated obligation. This Court has found that the parties agreed to continue the rental agreement at a rate of $2,399.60 per month effective August 1, 1981. Since that time, the Elks have been stayed from enforcing their judgment of foreclosure. Though the Hewitts have attempted to increase the rent since that time, to allow such action would not be equitable in light of the stay preventing further action by the Elks and in light of the Hewitts' reliance on the not yet implemented reversal of acceleration of § 1124(2). Thus, it will be the order of this Court that rent shall accrue on the Elks' lease at the rate of $2,399.60 per month from August 1, 1981. The rent is payable at such time as the Hewitts succeed in reversing the acceleration on their note by confirming a plan and curing the default. At that time, the parties will be free to vary their tenancy agreement pursuant to its terms or pursuant to applicable law.

5. The relevant Alaska Statutes read, in pertinent part:

   *AS 09.45.070. Action for forcible entry or detention.* (a) When a forcible entry is made upon a premises, or when an entry is made in a peaceable manner and the possession is held by force, the person entitled to the premises may maintain an action to recover the possession.

   *AS 09.45.090. Unlawful holding by force.* The following are cases of unlawful holding by force within the meaning of §§ 60–160 of this chapter:

   (1) when the tenant or person in possession of a premises fails or refuses to pay the rent due on the lease or agreement under which he holds, or deliver up the possession of the premises for 10 days after demand made in writing for the possession;

   (2) when, after a notice to quit as provided in §§ 60–160 of this chapter, a person continues in the possession of the premises at the expiration of the time limited in the lease or agreement under which that person holds, or contrary to a condition or covenant in the lease or agreement, or without a written lease or agreement;

   (3) when, after a notice to terminate the tenancy as provided in this title with reference to termination of estate at will or by sufferance, a person continues in possession of the premises after expiration of the time for determining the tenancy.

The Elks have not shown that they are entitled to damages due to any interference with their right to quiet enjoyment of the leasehold. Although there was some evidence of heated exchanges between the parties, this Court finds that there was no actual interference by the Hewitts with the Elks' use and enjoyment ·of the premises and that there was no intent on the part of the Hewitts to harrass the Elks.

In summary, this Court holds that the Hewitts are able, pursuant to § 1124(2), to cure the default on their note and deed of trust to the Elks and to reinstate the original terms of the obligation, even though the Elks received a judgment of foreclosure in state court before the Hewitts filed their Chapter 11 petition. The reinstatement must be done pursuant to a plan, and the Court will order submission of a plan and disclosure statement within sixty days of the date of the order. In light of § 1124(2) and in consideration of the excess valuation of the Fireside property over liens superior to that of the Elks, this Court finds that the debt owed to the Elks is adequately protected. The Hewitts are not entitled to possession of the premises leased by the Elks before such time as the Hewitts shall implement the benefits afforded them by § 1124(2) by the confirmation of a plan. An order shall be entered in conformance with this opinion.