In re ORLANDO TENNIS WORLD DE-VELOPMENT CO., INC., Debtor.

In re ORLANDO TENNIS ASSOCIATES LIMITED PARTNERSHIP, Debtor.

Bankruptcy Nos. 82–881–BK–J–GP, 82–882–BK–J–GP.

United States Bankruptcy Court, M.D. Florida, Orlando Division.

Nov. 9, 1983.

James L. Simon, Orlando, Fla., Ronald Bergwerk, Jacksonville, Fla., for debtor.

David R. McFarlin, Robert L. Mellen, Orlando, Fla., for Wells Fargo Bank.

## MEMORANDUM OPINION

GEORGE L. PROCTOR, Bankruptcy Judge.

In 1977, the debtor entered into a mortgage "spreader agreement" creating, among other interests, a mortgage lien on certain real property. The agreement was assigned to Wells Fargo on May 7, 1979. The parties continued according to the terms of the agreement until January, 1982, at which time the debtor withheld the entire interest payment due. The non-payment, by debtor's own admission, was intended as a renegotiation tactic, and did not result from an inability to pay. On April 15, 1982, Wells Fargo accelerated the indebtedness, declaring all principal covered by the agreement to be due and owing. It subsequently filed a state court foreclosure action against the debtor.

A summary judgment of foreclosure was entered by the Circuit Court in and for Lake County, Florida, on November 19, 1982, from which no appeal was taken. On December 10, 1982, Orlando Tennis World Development Co., Inc., and Orlando Tennis Associates, Limited Partnership, a partnership whose ownership and management overlap considerably with that of Orlando Tennis World Development Co., Inc., filed for relief under Chapter 11 of the United States Bankruptcy Code. No foreclosure sale was held following the filing of the petitions because of the operation of the automatic stay.

Both Orlando Tennis Associates Limited Partnership and Orlando Tennis World Development Co., Inc., (hereinafter referred to collectively as the debtor) ultimately filed a combined Chapter 11 reorganization plan and a combined disclosure statement. Following this Court's approval of debtor's disclosure statement, the usual Chapter 11 balloting process took place and the issue of confirmation of the plans came before this Court for hearing on August 3, 1983.

Wells Fargo, which was designated in the debtor's plan as the Class 1 secured creditor and characterized by the debtor as unimpaired, voted to reject the plan. Wells Fargo also maintains that it is in fact impaired under the plan within the meaning of 11 U.S.C. § 1124(2)(B), which characterizes a creditor as unimpaired when a debtor:

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

(A) cures any such default, other than a default of a kind specified in section 365(b)(2) of this title, that occurred before or after the commencement of the case under this title;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest;

If we find that Wells Fargo is not impaired within the meaning of § 1124(2), then we must confirm the plan, assuming that we find it feasible. If we find that Wells Fargo is in fact impaired, then we must proceed to the "cramdown" hearing provided for under 11 U.S.C.

There are two issues for our determination: (1) the threshold question of whether Wells Fargo is impaired by the debtor's plan under 11 U.S.C. § 1124(2); and (2) assuming a finding of unimpaired status, the correct measure of "damages" within the meaning of § 1124(2)(C).

Bankruptcy courts in several jurisdictions, and in one instance a district court considering the issue on appeal, have addressed the first issue on analogous facts, i.e., when a default judgment had been entered against a real property mortgagor, and the mortgagor subsequently seeks, under Chapter 11, to treat the mortgage as unimpaired through cure of the default and

reinstatement of the plan. The holdings have followed two divergent paths.

The district court case, *In re Madison Hotel Associates,* 29 B.R. 1003, 10 B.C.D. 770 (D.Wis.1983) held that a judgment of foreclosure should be distinguished sharply from the "applicable law" and "contractual provision" terms of § 1124(2) and emphasizes the finality of the foreclosure judgment as a bar to relitigation of the issues and as event finally cutting off the mortgagee's right in the realty. Other cases decided under § 1124 to similar effect are *In re Monroe Park,* 18 B.R. 790 (Bkrtcy.D.Del. 1982), and *In re St. Peter's School,* 16 B.R. 404, 409–10 (Bkrtcy.S.D.N.Y.1982).

■ It has long been the law in Florida that the right or "equity" of redemption is inherent in any mortgage. *Quinn Plumbing Co. v. New Miami Shores Corp.,* 100 Fla. 413, 129 So. 690 (1930); *Rosen v. Hunter,* 227 So.2d 689 (Fla.App.1969). F.S. 45.-031(a), enacted in 1977 and governing judicial sales of real (as well as personal) property, provides in pertinent part, "In cases when a person has an equity of redemption, the Court shall not specify a time for the redemption, but the person may redeem the property at any time before the sale."

The statute also provides that the sale shall take place no less than twenty days following the entry of judgment of foreclosure; Florida policy favoring the exercise of the equity of redemption is apparent.

■ Thus the finality of the judgment of foreclosure is always subject to the exercise of the equity of redemption, and it is the foreclosure sale rather than the entry of judgment which cuts off the mortgagor's rights. A comparable provision in Alaska law was deemed by that Bankruptcy Court in *In re Hewitt,* 16 B.R. 973, 8 B.C.D. 895 (Bkrtcy.D.Alaska 1982) to add weight to its interpretation of § 1124(2) favorable to the debtor under circumstances similar to those before us. "Since application of the Congressional policy of § 1124(2) will not further add to the uncertainties of the state system, particularly where, as here, no fore-closure sale has been held, the policy should be given effect."

(While *Hewitt* appears to suggest that even the occurrence of a foreclosure sale does not necessarily preclude the utilization of § 1124(2), we need not adopt quite such an expansive view for this Decision. When operation of state law has entirely extinguished the equities of the mortgagor, we do not believe that a resurrection can be effected through § 1124.)

Wells Fargo urges that it is inequitable for the debtor to reap all of the benefits of § 1124(2) when its default resulted from a negotiating tactic rather than the inability to pay. Neither Congress nor the few cases decided under § 1124 address such a situation. It appears to this Court that when an eligible debtor files for reorganization under Chapter 11, we are not authorized to mete out harsher conditions to a debtor because its conduct toward a creditor was subject to criticism, or because that conduct entitles the creditor to relief in another court.

■ The policy of § 1124 is best effectuated by initially finding damages on the basis of the positions of the parties on the event of Wells Fargo's acceleration of the indebtedness. Any and all contract interest, late charges, etc., which were due and owing as of April 15, 1982, are now due as damages to Wells Fargo. Attorney fees and expenses incurred by Wells Fargo in pursuit of the judgment of foreclosure are also appropriate § 1124(2)(C) damages, *See In re Masnorth Corp.,* 28 B.R. 892, 10 B.C.D. 553 (Bkrtcy.N.D.Ga.1983). The parties have already stipulated to a sum compensating Wells Fargo for such fees and expenses.

Wells Fargo argues that if we permit cure and reinstatement, we should nonetheless hold that all interest payments contemplated under the Agreement are now due and owing. Our position with respect to the contractual obligations of the parties is that, except for certain reliance-related damages, the positions of the parties must be as they were on the eve of acceleration. To determine otherwise would, in most if not all cases, create the same practical ef-

fect as simple nonallowance of reinstatement and cure. We cannot believe that Congress would set up a provision favorable to mortgage debtors on its face, only to intend the "damages" provision to render the benefit illusory in most instances.

The debtor argues that no damages in the form of contract interest for late payments should be awarded to Wells Fargo covering the period during which debtor paid into the registry of the state circuit court and later tendered directly to Wells Fargo, those sums which would have been due at those times had the default and acceleration not occurred. Wells Fargo argues that the tender was conditional and that Wells Fargo, having been under no legal obligation to accept such a tender, should not now be penalized in terms of interest due it.

The concluding paragraph of the cover letter accompanying the checks tendered to Wells Fargo beginning December 30, 1982, reads:

> Please advise your client that its refusal to accept this tender will constitute a waiver of any claim it may have to additional interest or other penalty arising out of alleged failure to timely pay.

It appears that the tender itself was unconditional; the only condition was placed on non-acceptance of the tender. Nonetheless, prior to December 2, 1982, it appears that refusal to accept any tender was a reasonable reliance on contractual provisions in that it was meant to avoid waiver of rights which Wells Fargo had under the agreement. After entry of judgment of foreclosure (which was, as set out *supra,* quickly followed by the filing of debtor's Chapter 11 petition), Wells Fargo's position that it was reasonably relying on contractual provisions loses strength. With the entry of the judgment of foreclosure, Wells Fargo had nothing to gain in refusing, or to lose in accepting, the debtor's tenders. Acceptance with appropriate reservation would certainly have had no effect on the principal legal determination that remained in the case, i.e., this Court's decision as to the effect of a judgment of foreclosure on the ability of the parties to cure and reinstate under § 1124.

In other words, even though interest and late charges would not have accrued in Wells Fargo's favor had it opted to accept the debtor's tenders of payment before December 10, 1982, given the fact that Wells Fargo's refusal to accept such tender was an entirely proper exercise of contractual rights, and very likely done with the intention of protecting the bank's legal position, interest lost and late charges incurred against the debtor on account of such refusal are properly damages under § 1124(2)(C). The debtor has already conceded interest on the payments missed before it began to tender funds into the registry of the state court. In addition, we find that damages should include the difference between the 6 percent interest drawn on the court registry deposits and the 8½ percent interest owing under the terms of the Agreement for September through November, 1982.

As best we are able to determine using figures supplied us by the debtor, such additional damages should also include $113.33 interest for the payment missed between August 6, and September 21, 1982, i.e., the time between that which the payment was originally tendered into the state court registry, and entry of the order permitting the deposit was entered; thereafter, as noted above, $99.99, representing the difference between 2½ percent interest due under the contract and 6 percent interest accrued in the registry of the state court for the subsequent three months until debtor's petition was filed.

We feel that it is consistent with the general policy followed in the reported cases of "turning the clock back" to the time of acceleration to leave late charges due at that time intact. (According to Wells Fargo's calculations, this amount (relating to January through April, 1982), the total late charge due at that point was $4,199.64.) Late charges arising after acceleration, we find are not damages under § 1124(2)(C). Six cents on the late dollar, assessed on a monthly basis, does not appear to be a figure related to actual antici-

pated economic loss; it appears, rather, to be in the nature of a penalty and presumably not within the contemplation of the drafters of § 1124(2)(C).

Thus, we find that damages owing to Wells Fargo are:

| Interest | — | $ 4,293.20 |
| Late charges | — | 4,199.64 |
| Attorney fees | — | 32,000.00 |
| Related costs | — | 2,132.24 |

Wells Fargo argues that it is impaired not only through exercise of cure and reinstatement of the mortgage but also through a change in the shareholders of the corporate debtor and in the partners of the partnership debtor. The Agreement provides that any change in shareholders requires prior written consent of the parties and that percentage ownership in the partnership was to be limited to the conditions set forth. It is not disputed that the debtor is not in compliance under both the corporate and partnership restrictions. Wells Fargo argues that any substitution of debtors without its consent is per se an impairment. In the absence of any evidence or suggestion that Wells Fargo's security is impaired, we will not hold that what appears to be a technical default equals impairment.

Having found that, after the debtor has paid its appropriate damages, Wells Fargo is unimpaired, we are left with the question of feasibility of the plan. Given that payment of damages should not have a major impact on debtor's ability to consummate the plan, we find that the likelihood of success is sufficient to call for a finding that the plan is confirmable under 11 U.S.C. § 1129(a)(11), which calls for confirmation where (assuming other applicable criteria are met):

> Confirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization, of the debtor . . . .

An order of confirmation in accordance with this Opinion will be separately entered.