**In re VICTORY CONSTRUCTION COMPANY, INC., Debtor and Debtor-In Possession.**

**Bankruptcy No. LA 80–07936–JA.**

United States Bankruptcy Court, C.D. California.

Aug. 2, 1984.

Joseph A. Eisenberg and Joel B. Weinberg, of Levene & Eisenberg, a Professional Corporation, Brown & Brown, Los Angeles, Cal., for debtor.

John A. Graham, Beverly Hills, Cal., David J. McCarty, Shappard, Mullin, Richter & Hampton, Los Angeles, Cal., for Cal. Fed. S. & L. Assoc.

Curtis B. Danning, Danning, Gill, Gould, Joseph & Diamond, Los Angeles, Cal., for Stad Trust and Ashkenazy Corp.

James E. Eichstaedt, U.S. Trustee, Los Angeles, Cal.

CONSOLIDATED MEMORANDUM OF DECISION REGARDING DEBTOR'S MOTION FOR CONFIRMATION OF PLAN, CREDITOR'S MOTION FOR CONFIRMATION OF AN ALTERNATE PLAN, AND CREDITOR'S MOTION TO DISMISS OR CONVERT CASE.

JOHN D. AYER, Bankruptcy Judge.

## INTRODUCTION

This is another chapter in a narrative that bids fair to become a bankruptcy epic. Four years ago, Victory Construction Co. filed a petition for relief under Chapter 11. The debtor's only asset was a single parcel of real property. Just nine days after filing, four secured creditors, intending to realize on their liens, filed a complaint seeking relief from the automatic stay. Five months later, the court granted relief. The court issued an opinion that has entered the folklore on the doctrine of "good faith" in bankruptcy law. *See In re Victory Construction Co., Inc.* 9 B.R. 549 (Bankr.C.D.Calif.1981) ("Victory I").[1]

Ironically, four years after filing and three and a half years after the order for relief, the debtor remains in possession of the property, major creditors remain stayed from foreclosure and the case remains pending before me. Currently on the table are three applications: (1) a motion by the debtor seeking confirmation of its second amended plan of reorganization; (2) a motion by the largest creditor seeking confirmation of its competing plan of reorganiza-tion; (3) an alternative motion by the same creditor (who was one of the "winners" three and a half years ago) to dismiss the case or convert it to a case under Chapter 7. Mindful that my decision is almost certainly not the last in the matter, and hopeful that the whole case is *sui generis,* I find that the debtor's plan meets the requirements of confirmation, and that the creditor's plan does not meet the standards of confirmation.

## THE FACTS

The early history of *Victory* is well known to bankruptcy specialists. There is a building at 8511 Beverly Place in Los Angeles. It was once owned by an entity known as the Cave Club, Inc. A majority stockholder in the Cave Club was John Hadley ("Hadley"). California Federal Savings and Loan ("Cal Fed") held a security interest in the real estate. The Cave Club sold the real estate to Leslie Linder's London Club ("the London Club"). Hadley, as trustee for the Cave Club shareholders, took back a security interest, junior to Cal Fed's. When the London Club failed to make payments, Cal Fed, relying on a due-on-sale clause in its trust deed, recorded a notice of default and intention to sell.

Before Cal Fed could sell, the London Club filed a petition in bankruptcy. The bankruptcy trustee, unable to service the debt, determined to sell the real estate. He first put it up for option, where he got a bid of $1.85 million, which he rejected as too low. Thereupon the trustee set out to find another and better sale.

Fred Roven ("Roven") is experienced as a real estate developer and trader. He has operated through a number of entities. One was a firm called Devonshire Corporation ("Devonshire"). Another is Victory Construction Company ("Victory"). From 1976 to 1979, Victory was dormant and Roven was operating through Devonshire. In 1979 Devonshire filed a bankruptcy petition under old Chapter XI. Later the same year, Roven began to dicker with the trus-

---

1. For obvious reasons, I forbear to call it the "Famous Victory."

tees of the London Club for the purchase of the London Club real estate.

The property was subject to a number of liens, including those of Cal Fed and Hadley, *Victory I*, 9 B.R. 549, 550. Roven saw it as a speculative opportunity—at one point he called it a "crap shoot." In any event, on December 3, 1979, he paid $5,000 to purchase an option on the property. He signed an option agreement saying that "buyer wishes to purchase the real property by assuming [existing] liens but needs time in which to negotiate with holders of the liens on the real property terms for the assumption of the liens." The option agreement identified the prospective buyer as Victory.

Roven needed help to put the deal together. He negotiated an informal partnership with Severyn Ashkenazy ("Ashkenazy"), also an experienced entrepreneur. They made an oral agreement to share the costs and profits of the project (Ashkenazy operating through something known as "the Stad Trust"). They made some preliminary forays at development, hoping to replace the existing building with a hotel. Roven negotiated with lenders. They were unable to get agreements restructuring the debt. Nonetheless on March 24, 1980, Victory exercised the option. Victory paid $107,500 to exercise the option (in addition to the $5,000 "crap shoot") and assumed debts of about $2.9 million, but with the hope of scaling them down. Hadley promptly recorded a notice of default under his trust deed. Victory sued in state court to enjoin the prospective foreclosure. The state court refused the injunction. Hadley set his sale for August 12, 1980. On August 11, Victory filed this petition. Four creditors (including Hadley but not including Cal Fed) brought their action from relief from the stay and on January 26, 1981, Judge Ordin filed his opinion granting relief from the stay. *Victory I*, 9 B.R. 549.

Most of this is familiar to those who have read *Victory I*. (For a more detailed statement of facts, *see Victory I* at 560–63). The rest of the story is less well known, although the next chapter begins with the next case in the reports—*Hadley v. Victory Construction Co., Inc*, 9 B.R. 570 (C.D. Calif.1981) ("Victory II"), filed just a month later on February 23, 1981. What happened was this. Victory owed Hadley some $1.35 million. Victory appealed *Victory I*, and sought a stay pending appeal. Victory offered to pay, as a condition of the stay, interest at the *contract* rate—eight percent per annum. The court granted Victory its stay, but only on condition that it pay at the *market* rate—which the court, in February, 1981, found to be 18 percent. Victory acquiesced, undertook to pay the 18 percent, and took its appeal.

One might have thought that the focus would have shifted to the appellate panel at this point, but it was not to be so. Instead on May 19, 1981, Victory, enjoying the protection of its appeal stay, made the logical next move of a Chapter 11 debtor—it proposed a plan. The plan undertook, among other things, to reinstate Hadley at his original contract rate. The debtor later abandoned that first plan, evidently anticipating that Judge Ordin would deny confirmation.[2] Instead, the debtor on December 10, 1981 offered an amended plan. The most noteworthy distinctions of the amended plan were, first, a 50 percent increase in the interest rate proposed for Hadley (from eight to 12 percent), and, second, the inclusion of a personal guarantee from Severyn Ashkenazy and his brother, Arnold Ashkenazy ("the Ashkenazy brothers").

Over the next year and a half, that amended plan subsided into a farrago of conflict where it very nearly disappeared. There were a succession of objections, hearings on objections, findings, objections

---

2. In fact it appears that no order denying confirmation was ever docketed. Hadley has furnished me, however, with a document entitled "Findings of Fact and Conclusions of Law in re: Denial of Confirmation of Debtor's Plan of Reorganization," bearing what appears to be Judge Ordin's signature and attached to a certificate of service signed by a deputy clerk. The debtor has not disputed that there is such an order, and in any event, my decision would render the point moot.

to findings and the like, all of which seemed to accomplish little on either side, except to generate attorneys' fees. Hadley was the principal opponent but along about the end of 1982 he picked up an ally—Cal Fed, previously quiescent but henceforth energetically active in opposition.

That was the situation when Judge Ordin left the bench and I succeeded to his docket in the summer of 1983. Several hearings ensued at which counsel and I tried—without much success—to disentangle the issues and the record. Thereafter on December 15, 1983, the debtor withdrew the controverted first amended plan and filed the debtor's second amended plan of reorganization, which is the debtor's plan pending now. The plan marks a retreat from the first plan in that it falls back on the old market rate of interest. However, it adds personal guarantees from the Ashkenazy brothers, Roven, and the Stad Trust.

Thereafter on February 15, 1984, the Bankruptcy Appellate panel filed its opinion reversing *Victory I. In re Victory Construction Co., Inc,* 37 B.R. 222 (B.A.P. 9th Cir.1984) ("Victory III"). The appellate panel, reviewing events that occurred after the appeal, held that Judge Ordin had, in effect, reversed his own prior order. The panel said that the case had become "tantamount to one providing adequate protection." The panel continued:

> As a result of the trial court's de facto reversal of its own order, substantial payments have been made by the debtor, the purpose and application of which remain undefined but require consideration in the light of the changed relationship which now obtains between appellees and the debtor. There is little question but that events subsequent to appeal have outrun the original issues, thereby rendering them moot.

*Victory III,* 37 B.R. at 228.

Hadley has appealed the appellate panel decision to the Ninth Circuit. Meanwhile Victory remains, as it was four years ago, a shell for holding the real estate. Roven indicated that he has abandoned plans to replace it with a hotel, but he did have plans drawn up to remodel the building. The property has been used for daily rentals from time to time, yielding a few thousand dollars in income. But throughout the period, Victory, according to Roven, "has dealt with many lawyers mainly." Several claims against the debtor have been paid off or compromised (which accounts for the changing cast of characters in the case). It appears that Ashkenazy and Roven must have paid out a considerable sum to keep the project intact—including in excess of $800,000 to Hadley—but there is nothing like a detailed record on the point.

After the appellate decision, Hadley filed its own plan, in competition with the debtor's second amended plan, already pending. This creditors' plan provided that the debtor pay interest on its obligation to Cal Fed at 13 percent (instead of the contracted 8.25) and to Hadley at 15 percent (instead of the contract eight—and instead of the 18 percent required in the appellate stay). Hadley also, as an alternative, filed a motion to convert or dismiss the case.

Hadley, of course, objected to the debtor's plan, as did Cal Fed. The debtor objected to Hadley's plan—as did Cal Fed. Cal Fed also objected to conversion, although it did not object to dismissal. These are the matters pending before me. But before proceeding to the specific applications, I think it may be desirable to risk a few further thoughts on the general topic of good faith.

## GOOD FAITH

Judge Ordin made this case famous with his opinion in *Victory I.* He expanded his views at exhaustive length in an article, *see* Ordin, *The Good Faith Principle in the Bankruptcy Code: A Case Study,* 38 The Bus.Law. 1795 (Aug.1983). His paper is certain to stand for some time as the seminal work on good faith as a legal category in bankruptcy. But a legal category of this sort is not a thing in itself. It has meaning only if it has some expository convenience—if it can help counsel and litigants to understand just what they should and

should not do in any given case. We are indebted to Judge Ordin's scholarship for the following inescapable conclusion: "good faith" is utterly unable to do this sort of job. As Judge Ordin has shown, the term covers too many different kinds of conduct, in too many different situations. Indeed one is tempted to say that it is not a category at all, but merely a perjorative phrase, functioning at such a high level of abstraction that one can scarcely discern what might be underneath it. With all the cases before us, we can see that there is no principle uniting them. There is no showing that the same sorts of facts are not dealt with elsewhere in the law, perhaps in a more coherent fashion. In a search for a principle, one might as well take all cases in which the plaintiff is named "Smith," or which were filed on a Tuesday.

The consequences of this sort of uncertainty are evident from the record we have in this case: after four years, neither the courts nor counsel seem to be able to reach any reliable agreement on just what the issues are.

 I am of course not free to excise the concept of good faith from the law of bankruptcy, even if I chose. *See* e.g., 11 U.S.C. 1129(a)(3) (1982) ("good faith" as a statutory confirmation standard); *In re Thirtieth Place, Inc.*, 30 B.R. 503 (B.A.P. 9th Cir. 1983); *In re Del Rio Development, Inc.*, 35 B.R. 127 (B.A.P. 9th Cir.1983); *In re Mallas Enterprises*, 37 B.R. 964 (B.A.P. 9th Cir.1984). *Cf. In re Nite Lite Inns*, 17 B.R. 367 (Bankr.S.D.Cal.1982). But the cases make it clear that this provision is to be read restrictively. It is on this basis that I review the issue of good faith one more time.

Victory is a one-asset, secured-credit real estate case, after the manner of an old Chapter XII. Whatever may have been the rule four years ago, it now seems clear that a one-asset, secured-credit real estate

case is properly within the jurisdiction of the bankruptcy court. Indeed, cases of this sort account for perhaps as much as half of our Chapter 11 docket.

Victory was a moribund corporation, re-vivified to take title to the asset in question, just shortly before filing. In *Thirtieth Place, supra*, the appellate panel ordered relief on facts that bear a superficial similarity to these—a shell corporation, created to take title to the subject property. But the differences seem to me to be crucial. First, it appears that the corporation in *Thirtieth Place*, took title solely for the purpose of filling the proceeding. The record here supports a different inference. It seems almost certain that Roven considered bankruptcy as a possibility before taking title in Victory. But it seems equally likely that he also wanted to continue negotiating with his creditors, and he wanted to avoid bankruptcy if possible. Second, *Thirtieth Place* is a case of pure self-dealing. The transferor and transferee were in essence the same enterprise. The transaction was a peel-off, presumably to protect the transferor's balance sheet. Here, the transferor was a third party—the trustee of the London Club. He could have refused to sell to Victory if he wished. He could have insisted on a guarantee from Roven. And Roven could have walked away. Evidently the trustee, in a position to appraise the risks, throught this was the best deal he could get.

On its face then, *Thirtieth Place* seems to me to make a much stronger case for relief from the stay than Victory. Yet the appellate panel decision was only 2–1. Judge George, dissenting, would have found even this case a permissible filing.

Aside from *Thirtieth Place*, the most extensive appellate panel discussion on point is *Victory III*. This opinion presents some problems in interpretation.[3] But one

---

**3.** Most important, Judge Volinn seems to have misunderstood a piece of the record (hardly surprising, under the circumstances). In *Victory III* at pages 227–8, he quotes a colloquy concerning the interest rate in the debtor's first amended plan, since withdrawn. If he based

his decision on the interest rate in that first amended plan, then the logic of the entire opinion collapses, because that first amended plan was later withdrawn. But it appears from the whole opinion (including the passage quoted above) that he was actually thinking about the

thing is inescapable: the appellate panel had the opportunity to affirm Judge Ordin, and to grant relief from the stay on the theory that the case was not properly before the bankruptcy court. And this is precisely what the panel refused to do. *See also In re Del Rio Development, Inc.,* 35 B.R. 127 (B.A.P. 9th Cir.1983); *In re Mallas Enterprises,* 37 B.R. 964 (B.A.P. 9th Cir.1984).

What seems to bother Hadley and Cal Fed most in this case is that Roven appears to be a man unterrified by the idea of bankruptcy. He creates corporations to insulate his personal assets. If their future is promising, he sees to it that they get money—very carefully, like water in a drip irrigation system. If not, he seeks the protection of the court. He clearly takes the possibility of bankruptcy into account. Indeed, perhaps the most remarkable thing about this record is that the man who as trustee sold the London Club to Victory is the same man who as attorney represented Devonshire in its Chapter XI case (he also now represents Ashkenazy in this case). There has never been any secret of this, and so far as I can tell, none of the creditors asserts that there is any specific impropriety here. But it does suggest a certain inbred, neurasthenic quality that is bound to aggravate the frustration of anyone who thinks a debtor ought to pay his bills.

All of this might suggest "bad faith" to the person on the street. But ironically, as I tried to suggest above, a too free use of the concept in the bankruptcy court may increase, rather than reduce, the confusion in a case like this, and correspondingly increase the capacity of debtors to keep creditors at bay. I do not think that Congress, glossed by the appellate panel, in-

tended me to use the concept in that way. For these reasons, I think the general issue of "good faith" must be resolved in favor of the debtor, and I so hold.

I do not for a moment suggest that a case should proceed as this one has proceeded, of which more later. For the moment, let me turn to the debtor's plan.

### THE DEBTOR'S PLAN

■ As I indicated above, the most noteworthy features of the debtor's plan is that the debtor seeks to reinstate Hadley and Cal Fed at their old interest rates, together with personal guarantees of Roven, the Ashkenazy brothers, and the Stad Trust. Obviously it contains a number of other provisions. I hold that the standards of confirmation have been met. *See* 11 U.S.C. § 1129 (1982), Bankr.R. 3020, Official Form No. 31. To limit the length of this opinion, I will limit my discussion to issues that invite detailed examination.

*Res judicata:* Hadley [4] asserts that this plan is essentially the same as the plan that Judge Ordin refused to confirm in 1981. Assuming that confirmation was in fact denied (*see* footnote 2, *supra.*), the objection is not compelling. Hadley concedes that the new plan includes a guarantee from the Ashkenazy brothers (it also includes guarantees from Roven and the Stad Trust). Hadley complains that the guarantee is not meaningful because it "can only be enforced through protracted litigation ..." The record does not support this assertion. The debtor and its backers evidently do not pay money cheerfully. And they may well have profited from the entanglements of this litigation. On the other hand, the record shows that they have dealt with—paid off or compro-

---

interim interest on appeal. See also *Victory III* [1] at 227–8. As is evident from the passage quote above, he specifically recognized the fact that the interest payment was provisional, and that there had been no decision on allocation of payments. On this assumption, his opinion continues to carry force.

**4.** Cal Fed echoes many of Hadley's objections, and much of the ensuing discussion applied to

Cal Fed as well. Cal Fed also insists that it has the right to exercise the due-on-sale clause, consistent with the holding of the U.S. Supreme Court in *Fidelity Federal Savings & Loan Assn. v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1983). Counsel for the debtor specifically conceded on the record that Cal Fed's rights under *de la Cuesta* are unaffected by this plan.

mised—several large claims against the debtor in the course of this case. And there seems to be no dispute that they have been making the appeal stay payments to Hadley. I find that confirmation is not barred by the principle of *res judicata.*

*Good Faith:* I have dealt with good faith generally in the previous section. With reference to the specific standard of good faith as a requirement for confirmation under Sec. 1129(a)(3), it may be useful to quote from Judge Katz's gloss on the phrase in *Nite Lite Inns:*

> Essentially, a reorganization plan is proposed in 'good faith' when there is a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.... The primary purpose of the reorganization chapters of both the Act and the Code has been to promote restructuring of debt and the preservation of economic units rather than a dismantling of the estate.

*In re Nite Lite Inns,* 17 B.R. 367, 370.

I accept this analysis as a gloss on Sec. 1129(a)(3), and I find that the debtor meets the standard of good faith under this definition.

*Best Interests:* 11 U.S.C. § 1129(a)(7) (1982) provides that I must find that the plan is in the "best interest" of creditors. *See* House Report No. 595, 95th Cong., 1st Sess. 412 (1977). Specifically, I must find that each creditor will receive or retain value that is not less than the amount he would receive if the debtor were liquidated. The debtor proposes to reinstate Hadley's loan. Hadley's loan bears an obligation to pay interest at eight percent *per annum* (Cal Fed's is at 8.25). Hadley argues that the current market rate of interest is much higher. He introduced a declaration from a consulting economist asserting that the current market rate on the Hadley obliga-

tion is 15 percent and the Cal Fed obligation, 13 percent (in fact, these are the rates used in the Hadley plan). The economist declares that the market rate on the Hadley obligation had averaged 18.12 in the period from 1981 to the present. Hadley thus argues that on liquidation, he would be free to reinvest the money in a "comparable" transaction at the higher current rate. He contends that forcing him to accept reinstatement thus gives him less than he would receive if the debtor were liquidated.

This is an elegant argument and it seems consistent with the language of the statute. It has the support of the unpublished decision of Judge Abrahams in *In re Los Altos Hotel Associates,* Bankr. No. 5–81–01943 (Filed Dec. 29, 1981, N.D.Calif.). The difficulty is that the argument proves too much. It means that the debtor could never use Sec. 1129(a)(7) in a case where the current market rate was higher than the contract rate. If the market rate is lower than the contract rate, then the debtor will not use Sec. 1129(a)(7) anyway; he will refinance in the current, lower market. If the market rate is identical to the contract rate, then presumably the rational creditor will permit reinstatement voluntarily and Sec. 1129(a)(7) will have no relevance. This analysis robs Sec. 1129(a)(7) of all content. This cannot have been the intent of Congress. On this analysis, I find the debtor has met the "best interest" standard. To the same effect, *see generally In re Forest Hills Associates,* 40 B.R. 410, 11 B.C.D. 1145 (Bankr.S.D.N.Y.1984); *In re Rainbow Forest Apartments,* 33 B.R. 576 (Bankr.N. D.Ga.1983); *Masnorth Corp.,* 28 B.R. 892 (Bankr.N.D.Ga.1983); *In re Rolling Green Country Club,* 26 B.R. 729 (Bankr.D.Minn. 1982).[5]

**5.** Hadley's counsel in final argument also raised the proposition that Sec. 1129(a)(7)(A) does not apply to a creditor who has made an election under Sec. 1111(b). He thereupon for the first time presented a document purporting to be an Sec. 1111(b) election. But the whole point of Sec. 1111(b) is to give protection to an allegedly

undersecured creditor; as Collier says, it "merely converts an unsecured deficiency claim into a claim secured by the electing creditor's collateral." 5 COLLIER ON BANKRUPTCY 1111.02[4] (15th ed. 1983).

By any measure, Hadley is an oversecured creditor. The election can therefore have no effect.

This is enough to settle the issue as a matter of law other things being equal. Hadley has no standing to complain if it made a bad bargain. Nonetheless, it may be helpful to point out that the 8 percent contract rate in this case is probably somewhat artificial. I have had occasion to observe, from the bench, a good many transactions of this sort, and I think I can take judicial notice of the fact that the principal obligation in a transaction like this normally impounds an implicit interest factor. In this case, Ashkenazy took the stand and testified to that effect. He put the implicit interest factor for this sort of transaction at 4 to 6 percent. If his analysis fits this particular transaction, then Hadley's actual rate may be closer to 14 percent.

*Lack of an accepting class:* Sec. 1129(a)(10) provides that at least one class of claims (other than insiders) must have accepted the plan. Hadley asserts that there is no such acceptance. The debtor argues, first, that he has established the relevant acceptance as a matter of law because all relevant classes are unimpaired, and an unimpaired class is "deemed to have accepted." *See* 11 U.S.C. § 1126(f) (1982). Second, he argues that he has an actual acceptance from a voting class. I hold that a relevant class is "deemed to have accepted" under Sec. 1126(f) and thus I rule for the debtor on his first argument. I suspect that the debtor might not be able to show that he has an actual accepting class, but since the point is not necessary for my decision, I do not make a specific finding on the point. I deal with each of these issues in turn.

Considering first the problem of "deemed acceptance"—this language has given rise to a great deal of confusion because the statute is simply not tightly enough mortised to hold a single undiluted analysis. *See generally* Fogel, *Confirmation and the Unimpaired Class of Creditors; Is a 'Deemed Acceptance' Deemed An Acceptance?* 58 Am.Bankr.L.J. 151 (1984). The debtor's argument (to repeat) is that a class that is "deemed to have accepted" under Sec. 1126(f) may supply the relevant "acceptance" under Sec. 1129(a)(10). But this analysis seems to contradict yet another section of the code, namely Section 1129(a)(8), 11 U.S.C. § 1129(a)(8) (1982). That latter section provides that a plan may be confirmed *if* "with respect to each class—(A) such class has accepted the plan or (B) such class is not impaired under the plan." This seems to suggest that there is a difference between "acceptance" (as in Sec. 1129(a)(8)) and "deemed to have accepted" (as in Sec. 1126(f)). If we take this distinction seriously, then a class that is "deemed to have accepted" under 1126(f) cannot supply the relevant "acceptance" for Sec. 1129(a)(10).

But this can lead to absurdities. An unimpaired class never formally "accepts" the plan; because it is unimpaired, it is not given the opportunity to vote and it is simply "deemed to accept". If the unimpaired class can never supply the relevant acceptance for Sec. 1129(a)(10), then the court could not confirm a plan leaving all classes unimpaired *even if no class objected,* because it would be impossible to find an "actual" accepting class. This cannot possibly have been the drafters' intent. *Cf. In re Union County Wholesale Tobacco & Candy Co., Inc.,* 8 B.R. 442 (Bankr.D. N.J.1981).

Surveying the case law, I think I can see a path out of this jungle. The path lies in the distinction between classes that are *un*impaired and those that are *impaired.* Section 1124 draws a distinction between unimpaired and impaired classes. Section 1126(f) provides that an unimpaired class is deemed to have accepted the plan. Section 1129(a) provides that a class may be bound, even though it is impaired, if it accepts the plan. And finally, section 1129(b) provides that a class may be bound *even though it is impaired and even though it does not accept* if the standards of that section are met. This is the so-called "cram-down" section; see generally Klee, *All you Ever Wanted to Know About Cram Down Under the New Bankruptcy Code,* 53 Am. Bankr.L.J. 133 (1979). Section 1126(f) provides that an *un*impaired class may be

"deemed to accept." Nothing in the Code provides for "deemed acceptance" on the part of an impaired class. I think that the Code is saying (though in somewhat Delphic tones) that I should recognize objections from impaired classes, though not from unimpaired classes.

Most of the cases analyzing Section 1126 seem to take this approach in fact, although they do not spell it out that way. Specifically: most of the cases refusing to "deem" acceptance involve objection by an impaired class. These cases seem to say that the court will require an *actual* acceptance if some impaired class objects. *See, e.g., In re Polytherm Inc.,* 33 B.R. 823 (W.D.Wisc.1983); *In re Lloyd,* 31 B.R. 283 (Bankr.W.D.Ky.1983); *In re Dreske,* 25 B.R. 268 (Bankr.E.D.Wisc.1982); *In re Spirited, Inc.,* 23 B.R. 1004 (Bankr.E.D.Pa. 1982); *In re Pine Lake Village Apt. Co.,* 21 B.R. 478 (Bankr.S.D.N.Y.1982); *In re Barrington Oaks General Partnership,* 15 B.R. 952 (Bankr.D.Utah 1981); *In re Marston Enterprises, Inc.,* 13 B.R. 514 (Bankr.E.D.N.Y.1981).

In the same vein, a number of cases have agreed to "deem" acceptance from an *unimpaired* class where there was no objecting *impaired* class. *See, e.g. In re Rainbow Forest Apartments,* 33 B.R. 576 (Bankr.N.D.Ga.1983); *In re Rolling Green Country Club,* 26 B.R. 729 (Bankr.D.Minn. 1982); *In re Masnorth Corp.,* 28 B.R. 892 (Bankr.N.D.Ga.1983); *In re Bel Air Assocs., Ltd.,* 4 B.R. 168 (Bankr.W.D.Okla. 1980) (objecting *interest,* not a claim).

Judge Mabey, deciding *In re Barrington Oaks General Partnership,* 15 B.R. 952 (Bankr.D.Utah 1981), asserted that this approach is consistent with the legislative history. He says:

> Section 1129(a)(10) was interposed so that confirmation would be disallowed 'in situations where no class of affected [i.e., impaired] creditors has voted for the plan.' At that time the bills did not

contain a deemed acceptance provision for unimpaired classes. Thus, Section 1129(a)(10) accomplished its objective as drafted. The subsequent addition of Section 1126(f) rendered unclear the language of Section 1129(a)(10) but did not obscure its intent as articulated in the legislative record.

Id. at 970.

This result is supported by language in Sec. 512 of the Bankruptcy Amendments and Federal Judgeships Act of 1984. It amends Sec. 1129(a)(10) to provide that "if a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan [must accept] the plan, determined without including any acceptance of the plan by any insider." *See* Sen. Rep.N. 305, 96th Cong. 1st Sess. 15 (1979).

The question then arises whether Hadley is an impaired class. Section 1124 is dispositive. It provides that a class is not impaired if the plan cures any defaults and reinstates the maturity of the claim as it existed before default. *See* 11 U.S.C. § 1124(2) (1982). This is precisely what the debtor proposes to do in his plan. Such reinstatement leaves the creditor unimpaired as a matter of law even if the current market rate of its interest is higher than the contract rate. *See generally In re Forest Hills Associates,* 40 B.R. 410, 11 B.C.D. 1145 (Bankr.S.C.N.Y.1984), *In re Rainbow Forest Apartments,* 33 B.R. 576 (Bankr.N.D.Ga.1983), *Masnorth Corp.,* 28 B.R. 892 (Bankr.N.D.Ga.1983), *In re Rolling Green Country Club,* 26 B.R. 729 (Bankr.D.Minn.1982).[6]

Hadley also argues that he is impaired because of the debtor's bad faith. Since I have found that the debtor's plan was not proposed in bad faith, the question becomes moot. On this analysis, Hadley is not impaired.[7] Since there is thus no objecting impaired class, I find that I may "deem" acceptance sufficient for Sec. 1129(a)(10).

---

6. Cases like *In re Monroe Park,* 17 B.R. 934 (D.Del.1982) and *In re Virginia Foundry Co.,* 9 B.R. 493 (W.D.Va.1981) involve adequate protection payments in the pendency of a case prior to confirmation and thus have no direct bearing on requirements under Sec. 1129.

7. Nor, on the same analysis, is Cal Fed.

Aside from the "deemed acceptance," the debtor asserts that he has a real acceptance. The acceptance was presented by Fred B. Green, a contractor who once did some work on the property and litigated his lien claim against the debtor early in the Chapter 7 case. Hadley asserts that the "acceptance" is invalid because it was late; because it was presented without an adequate disclosure statement; and because the claim in fact belongs to the Stad Trust, which Hadley asserts is an insider.

I am not impressed with the first two objections, but the third is more serious. I think there was ample disclosure in this case, as I explain in detail below. I agree that the acceptance was received after the formal bar date, but I think it would be an abuse of discretion to insist on the deadline if there were otherwise no prejudice to the estate. The status of the ownership of the claim is somewhat more problematic. Evidently the Stad Trust either will succeed, or has succeeded, to Green's interest, as part of the settlement of the earlier litigation. The Stad Trust is clearly an insider pursuant to 11 U.S.C. § 101(25)(B)(v) (1982), whose vote could not be counted pursuant to 11 U.S.C. § 1129(a)(10) (1982). One possibility is that the Stad Trust and Green have an arrangement that makes it possible for the claim to belong to either as convenient at a particular moment. On the basis of the record before me, I could not find the Green acceptance sufficient. Fortunately for the debtor, I do not need to, because I find that no such acceptance was necessary.

*Feasibility:* Sec. 1129(a)(11) provides that I must find the plan to be feasible. See House Report No. 595, 95th Cong., 1st Sess. 413 (1977); Senate Report 989, 95th Cong. 2d Sess. 128 (1978), U.S.Code Cong. & Admin.News 1978, 5787. Specifically I must find that confirmation is not likely to be followed by liquidation, or the need for further financial reorganization. Hadley says the debtor's plan does not meet this standard "in view of the uncertainty as to the reliability of Victory's source of payment." This overlooks the fact of the guarantees, and the fact that no one has seriously disputed the solvency of the guarantors. I find that the debtor has met this standard of feasibility.

*Disclosure:* Hadley argues that Victory's disclosure of the relevant facts and circumstances has been inadequate for the court to make an informed decision regarding the merits of the plan. *See* generally 11 U.S.C. § 1125 (1982). Given the context of the case, this objection is very nearly frivolous. In the first place, since no class was impaired, no disclosure statement is required. *See, In re Union County Wholesale Tobacco & Candy Co., Inc.,* 8 B.R. 442 (Bankr.D.N.J.1981).

But whether required or not, a disclosure statement was filed in connection with the debtor's original plan, and won approval from the court on or about October 7, 1981. Over the course of the case, Roven has been deposed at least three times; Ashkenazy at least once. There were four days of trial at the beginning of the case, and there have been innumerable hearings.

At a hearing on November 29, 1983, I suggested that requiring a new disclosure statement would serve no purpose other than to create further delay. Counsel for Hadley and Cal Fed each concurred. Counsel for Cal Fed said: "I think everyone knows as much as they need to know about this case." Counsel for Hadley said: "I think I know the facts of this case probably more than I ever wanted to know in my whole life."

*Constitutional objections:* Hadley also argues that reinstatement under Sec. 1124 "would infringe upon Hadley's due process rights, especially in view of its retroactive application to the Hadley notes which predate the enactment of the Bankruptcy Code. There is language to support this proposition in *United States v. Security Industrial Bank,* 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982), where the Supreme Court indicated (in *dicta*) that the Bankruptcy Code cannot be applied retroactively to destroy due process rights. But the Court could not have intended that this language be read broadly. It is arguable

that virtually every provision of the Bankruptcy Code trenches on a "right" of somebody's. If the Bankruptcy Code does not apply to pre-enactment transactions, then there is no applicable bankruptcy law at all. This cannot have been what the Court had in mind.

Fortunately, *Security Industrial Bank* does not require so grotesque a reading. Justice Rehnquist himself acknowledged that the bankruptcy power "has been regularly construed to authorize the retrospective impairment of contractual obligations." *See* 103 S.Ct. at 410. *See also Hanover National Bank v. Moyses*, 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113 (1902). Hadley is going to get the value of its collateral. All Hadley has at stake on this issue is its right to accelerate, which even under the broadest interpretation can be no more than a contract right. *See generally Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). *Cf. In re Rainbow Forest Apartments*, 33 B.R. 576 (Bankr.N.D.Ga.1983).

I therefore hold that the debtor's plan meets the relevant requirements of confirmation as set forth in Sec. 1129.

### HADLEY'S PLAN

█ There remains the question of the competing Hadley plan. I find that Hadley's plan fails to meet the requirements for confirmation. I find a number of defects in the plan, but the chief of these is the fact that it includes interest rates for Hadley and Cal Fed at the purported current market, rather than the contract rate. The case in favor of this market rate is the mirror image of Hadley's case against the contract rate in the debtor's plan. But as I have tried to show above, Hadley cannot sustain his case against the contract rate. His case in favor of the market rate fails accordingly. The consequence of such a payment, without explicit authorization in the Code, would be to allow the secured

creditors to take more than 100 percent of their claims. It is clear that the drafters intended the court to deny confirmation where the plan proposes to pay more than 100 percent to a senior class without the consent of a junior. *See generally* Senate Report No. 989, 95th Cong., 2d Sess. 127–128 (1978).[8]

Anticipating my concerns, Hadley filed a "Modification" which in effect invited me to scale down the interest rate to a rate that I felt desirable or acceptable. But this misses the point. So long as the debtor has a statutory right to reinstate (as I believe he has), then any rate above that has the effect of giving the creditor more than his claim. In any event such a procedure would put me in the position of fashioning a plan for the parties. Nothing in the Code suggests that Congress intended me to undertake that role, and I decline to do so.

### MOTION TO DISMISS OR CONVERT

By finding that the debtor's plan is confirmable, I have rendered moot the question of whether the case should be dismissed or converted.

### THE STAY OF APPEAL

Only one issue remains. That is the question of the allocation of the 18 percent adequate protection payments. The appellate panel recognized that the issue remains open pending confirmation. One's first thought might be that if the debtor is permitted to reinstate, then he must have the benefit of any excess over the contract rate. The debtor may find support for this approach from the Ninth Circuit in *Crocker National v. American Mariner Industries, Inc. (In re American Mariner Industries, Inc.)*, 734 F.2d 426 (9th Cir.1984), footnote 12. *But cf. In re Monroe Park*, 17 B.R. 934 (D.Del.1982); *In re Virginia Foundry Co.*, 9 B.R. 493 (W.D.Va.1981).

But I do not think that any principle compels this result. From the start, the

---

8. The debtor raises an additional argument that the higher rates would be a violation of the California usury laws, but I decline to pass on the point.

payment was something other than compensation under the contract. Judge Ordin in *Victory II* expressly recognized that he was ordering a (supposed) market, rather than the contract, rate. The debtor paid has paid it on that basis—and with the recognition that he might never recover any of it at all.

As I indicated above, I believe Chapter 11 clearly gives the debtor the right to reinstate his contract. The lost opportunity to reinvest the money is a cost that the creditor, by statute, must bear. But that is not the only cost in the matter. Hadley has been embroiled for four years with a Chapter 11 estate. He has borne legal expenses which he can almost certainly not recover, together with uncertainties that are part and parcel of any litigation. Indeed, insofar as the law remains unsettled and this decision remains amenable to appeal, the issue remains uncertain today.

Under the circumstances, with respect to the interim payments, I think it is proper to leave the parties where I find them. I hold that the debtor may have credit against his adequate protection payments for interest at the contract rate on his ongoing contract obligation, but that the creditor may retain the balance.

## CONCLUSION

This opinion constitutes findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. The debtor is directed to submit orders accordingly.