In the Matter of ARLINGTON VILLAGE PARTNERS, LTD. Debtor.

Bankruptcy No. 3–85–02779.

United States Bankruptcy Court, S.D. Ohio, W.D.

Sept. 4, 1986.

Frank M. Root, Cox, Ginger & Root, Dayton, Ohio, for movant.

Emerson R. Keck, Allbery, Cross & Turner, Dayton, Ohio, for respondents.

## DECISION GRANTING MOTION PURSUANT TO 11 U.S.C. § 1124 FOR DETERMINATION AND ORDER

THOMAS F. WALDRON, Bankruptcy Judge.

This is a case arising under 28 U.S.C. § 1334(a) and having been referred to this court is determined to be a core proceeding under 28 U.S.C. § 157(b)(2)(B) and (O) in which the debtor-in-possession, movant, Arlington Village Partners, Ltd. (hereinafter Arlington), requests an order of the court determining the total amount it must pay pursuant to 11 U.S.C. § 1124(2) to Harold H. Singer and Sol S. Kling, creditors and respondents (hereinafter Singer and Kling, respectively), to cure the defaults, reinstate the maturity, and compensate for other damages in connection with a second mortgage due Singer and Kling. In addition to Arlington's motion, the court has before it Singer and Kling's reply memorandum and Arlington's supplemental memorandum.

### I. FACTS

On December 30, 1981, Arlington, a Florida limited partnership, signed two promissory notes totaling two million eight hundred eighty-eight thousand dollars ($2,888,-000.00): one to Harold H. Singer for his loan in the sum of one million four hundred forty-four thousand dollars ($1,444,000.00) to Arlington and a second note to Sol S. Kling for his loan in the sum of one million four hundred forty-four thousand dollars ($1,444,000.00) to Arlington. These notes were secured by a wraparound mortgage given by Arlington to Singer and Kling in land and buildings located in Fairborn, Ohio. The mortgaged premises are subject to a senior mortgage (Item 15) which is not in issue here. The property has an appraised value of three million seven hundred fifty thousand dollars ($3,750,000) (Arlington's motion) and Arlington agrees that

Singer and Kling are oversecured creditors (Tr. 1 Order on hearing on relief from stay held January 16, 1986).

The promissory notes given by Arlington to Singer and Kling are identical. Therefore, the amount in arrearage under the terms of each of the notes must be doubled to determine the total amount due from Arlington. Each note provides, in paragraphs 2, 3, 6 and 8, that:

Interest shall be charged from date at the rate of nine percent (9%) per annum for a period of two (2) years after date; thereafter interest shall be charged at the rate of ten percent (10%) per annum for a further period of two (2) years (or four (4) years after date); thereafter interest shall be charged at the rate of eleven percent (11%) per annum for an additional two (2) year period (or six (6) years after date); and thereafter for a final period of one (1) year at the rate of twelve percent (12%) per annum, or during the seventh year after date, and at the end thereof, the entire principal and accrued interest shall be due and payable.

The principal and interest shall be payable in monthly installments of Eleven Thousand Six Hundred Eighteen and 76/100 Dollars ($11,618.76), commencing on the 15th day of January, 1982, and on the 15th day of each month thereafter, including December, 1983; commencing on the 15th day of January, 1984 the monthly installments will be Twelve Thousand Six Hundred Thirty-Eight and 73/100 Dollars ($12,638.73) and will continue on the 15th day of each month thereafter, including December, 1985; commencing on the 15th day of January, 1986, the monthly installments will be Thirteen Thousand Six Hundred Fifty and 84/100 Dollars ($13,650.84) and will continue on the 15th day of each month thereafter, including December, 1987; commencing on the 15th day of January, 1988, the monthly installments will be Fourteen Thousand Six Hundred Fifty and 52/100 Dollars ($14,650.52) and will continue on the 15th day of each month thereafter, including December, 1988, at

which time, if not sooner paid, the entire principal balance and accrued interest shall be due and payable, less the then existing principal and interest due on the Senior Mortgage, if any. If the Senior Mortgage is paid off, there will be no reduction.

. . . .

*If default be made in the payment of any installment under this Note, and if default is not made good within fifteen (15) days after the holder shall give written notice thereof by certified mail, the entire principal and accrued interest shall at once become due and payable without further notice at the option of the holder of this Note.* Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default.

. . . .

A late charge shall be added to any payment hereunder in an amount equal to two percent (2%) of said payment if the same is not paid when due or within fifteen (15) days thereafter. *The principal balance owing on this Note, if not paid, at maturity, whether by acceleration or otherwise, shall bear interest at fourteen percent (14%) per annum until paid* (emphasis added).

Arlington defaulted on payments beginning with its installment due February 15, 1985. A foreclosure action scheduled for August 3, 1985, in the Common Pleas Court of Greene County, Ohio, Case No. 85 CV 120, was stayed by Arlington's filing on August 1, 1985, of a Chapter 11 petition in the Bankruptcy Court of the Central District of California at Los Angeles. On October 2, 1985, the California court confirmed the debtor's Plan of Reorganization. Without objection by any party, the California court concluded that the principal place of business of the debtor is in the Southern District of Ohio, Western Division, and the case was transferred to this court in December of 1985.

The confirmed plan of reorganization provided as to Singer and Kling's claims (denominated S & K in the plan) that:

4.2 The *Class 2 Claims* of S & K are unimpaired pursuant to the provisions of Section 1124(2) of the Code. On the Effective Date, or as soon as may be practicable thereafter, the Reorganized Debtor will:

(a) Cure any defaults by the payment of principal and interest in such amounts determined by the Court to be due on account of such Class 2 Claims; and

(b) Reinstate the maturity of such Class 2 Claims; and

(c) Compensate the holder of such Class 2 Claims for such costs and charges as are determined to be proper by the Court.

From and after the Effective Date, the Reorganized Debtor shall make payments on account of such Class 2 Claims in accordance with the terms and provisions of the promissory notes secured by the mortgage described in Paragraph 1.10 hereof (emphasis in original).

The plan further provided for the bankruptcy court to retain jurisdiction for the purpose of resolving any disputes regarding interpretation of the plan and to enter orders in aid of consummation of the plan (Plan 8.3, 8.4).

Although the language of Arlington's plan simply repeats the statutory wording of 11 U.S.C. § 1124(2)(A), (B) and (C), no objection was filed by Singer and Kling to the plan and no instruction was sought by either party from the bankruptcy court in California regarding the amounts required to cure, reinstate and compensate pursuant to 11 U.S.C. § 1124(2). Furthermore, no payments of principal and interest were made by Arlington on October 3, 1985 (the

effective date of the plan) or thereafter until an order was entered by this court.

Singer and Kling filed a motion for relief from stay in this court, Case No. 3–85–02779(A), which was heard on January 16, 1986. At the conclusion of the hearing, this court ordered that Arlington pay on or before January 23, 1986, the sum of thirty thousand dollars ($30,000) a month for the post-confirmation default months of October 1985 through January 1986, and thirty thousand dollars ($30,000) a month thereafter, to be paid on the second day of each month, until such time as the total amount due Singer and Kling under the plan was determined. Arlington has complied with that order.

Subsequently, on April 8, 1986, the court entered an agreed judgment entry prepared by counsel for the parties which provided that not later than April 17, 1986, Arlington would pay to Singer and Kling the sum of two hundred thirty-six thousand eight hundred and seventy-five dollars and eighty-three cents ($236,875.83) representing: (1) the undisputed amounts of principal and interest for pre-confirmation mortgage payments due for February through September 1985, (2) late charges from February through December 1985, (3) attorneys' fees, and (4) an amount of interest at the lower of the two parties' calculations as to the minimum amount of interest due Singer and Kling. The parties submitted a letter to the court on July 24, 1985, stating that the only issue still in dispute is the amount of interest to be calculated as damages under 11 U.S.C. § 1124(2)(C).

## II. ISSUE

The parties present as the item remaining in dispute the formula or interest rate to be applied in calculating the damages necessary to compensate Singer and Kling pursuant to 11 U.S.C. § 1124(2)(C) [1] so that

1. Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—
   . . . .
   (2) notwithstanding any contractual provision or applicable law that entitles the holder

of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—
   (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;

reorganization under the plan may continue.

## III. ARGUMENTS OF THE PARTIES

The creditors, Singer and Kling, argue that there were three defaults by Arlington: (1) pre-petition defaults beginning with Arlington's failure to pay its note installment on February 15, 1985; (2) post-petition defaults beginning with Arlington's failure to pay its note installment subsequent to its filing of bankruptcy on August 1, 1985; and (3) post-confirmation defaults beginning with Arlington's failure to make payments required to cure following confirmation of the plan on October 2, 1985. Singer and Kling argue that the first two defaults can be cured only by reading 11 U.S.C. § 1124(2) (cure, reinstate and compensate what would otherwise be an impaired claim) with 11 U.S.C. § 1129(b)(2)(A)(iii) (confirmation of plans involving secured claims), and that a proper reading requires awarding a *default interest rate of fourteen percent (14%)* per year so that they can receive the indubitable equivalent of their claim and can be adequately compensated for damages incurred by their reasonable reliance on the contract's terms. Their position also concludes that the payment of late charges alone would not be sufficient to compensate them for their bargained for stream of income. They further argue that even if the fourteen percent (14%) default rate would not be applicable to the pre- and post-petition defaults, Arlington violated the terms of its own plan when it defaulted post-confirmation, thereby requiring a reinstatement of the default provisions under the original notes, and accordingly all future payments would be at the fourteen percent (14%) annual default rate on the unpaid balance.

Therefore, Singer and Kling calculated the amount of interest owing as one hundred ten thousand six hundred sixty-two dollars and sixty-eight cents ($110,662.68) based on a contract default rate of fourteen per cent (14%), calculated at ten percent (10%) for late payments for the months of February through December 1985, plus four percent (4%) times the remaining principal for that period, and at a contract rate of eleven percent (11%) for the late January 1986 payment, plus three percent (3%) times the balance of the principal remaining for that period.

Arlington, on the other hand, contends that the fourteen percent (14%) default rate established in the contract, however calculated for any time period, does not apply. Arlington asserts that Singer and Kling's argument that they are entitled to the indubitable equivalent of their claim is based on cases whose conclusions do not involve impairment (§ 1124(2)), but rather confirmation (§ 1129(b)(2)(A)(iii)) which issue has already been decided in this case. Arlington argues that Singer and Kling's citation to *Prudential Insurance Company of America v. Monnier (In re Monnier Brothers)*, 755 F.2d 1336 (8th Cir.1985), is misplaced since that case involved confirmation under § 1129(b) (cramdown) and those standards involve different considerations than the standards involving an impaired creditor seeking a cure under § 1124(2). Likewise, Arlington criticizes Singer and Kling's reliance on *Martin v. Commodity Credit Corporation (In re Martin)*, 761 F.2d 472 (8th Cir.1985), as inapplicable because it dealt with the standards by which a debtor may use collateral held subject to a security interest.

In support of its position, Arlington relies on *DiPierro v. Taddeo (In re Taddeo)*, 685 F.2d 24, 27 (2d Cir.1982), and argues

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or

11 U.S.C. § 1124(2) (emphasis added).

that "cure" under § 1124(2) and throughout the Bankruptcy Code means remedying the triggering event (cure) and returning to the pre-default status (reinstatement), and that the "damages" reference in § 1124(2)(C) does not mean the total contractual rights that could be realized by acceleration, but rather interest at the pre-default rate and reasonable attorneys' fees (compensation).

Arlington's position is that there is no distinction among pre-petition, post-petition and post-confirmation defaults. It argues that the "cure" under § 1124(2)(C) provides that creditors are entitled to additional interest on the arrearages for the period of default: in this case at the contract rate of ten percent (10%) per year on the February through December 1985 defaults, at the contract rate of eleven percent (11%) per year on the January 1986 default, and thereafter monthly payments of principal and interest at the current contract rate of eleven percent (11%) per year, *i.e.*, reinstatement of the contract's original terms.

## IV. OPINION OF THE COURT

### A. Cure and Reinstatement

The function of § 1124 is to set forth the conditions under which a class of claims or interests will be deemed unimpaired. This is an integral element of proposing a plan since the prime consequence of classifying a claim as unimpaired is its vote is not required for confirmation of a proposed reorganization plan. § 11 U.S.C. § 1126(f). One of the methods by which a claim based on a contract that provides for the acceleration of the entire debt after the occurrence of a default may be deemed unimpaired, is for the plan to (A) cure all defaults that occurred before or after the commencement of the case (excepting only § 365(b)(2) defaults); (B) reinstate the pre-default maturity of the claim; (C) compensate the holder of the claim for damages incurred as a result of reasonable reliance on the contract's terms; and (D) not otherwise alter the legal, equitable, or contractual rights which the holder of the claim has by virtue of the claim. § 1124(2).

These standards are different than "indubitable equivalency" standards (§ 1129(b)(2)(A)(iii)) applicable to a class holding impaired claims who have voted against a plan and find the plan "crammed down" upon them under § 1129(b). To be sure, creditors may argue that § 1124 is also a "cramdown" provision, insofar as it is also a statutorily authorized modification of an existing contract determined without regard to the creditor's consent; however, it is the essence of a bankruptcy court's function in a reorganization case to determine the existing and future terms of the contracts of the parties involved. The issue is whether the determination is to be permitted or denied by existing statutes and case law. If bankruptcy reorganization legislation did not provide the debtor with the ability to commence and continue a plan following a default, it could not fulfill its purpose, since inevitably it is default, immediate or imminent, which occasions bankruptcy filings. "[C]uring a default, even though it inevitably changes a contractual acceleration clause, does not thereby 'impair' a creditor's claim." *In re Taddeo*, 685 F.2d at 28–29; *see also In re Madison Hotel Associates*, 749 F.2d 410, 419 (7th Cir.1984); *Levy v. Forest Hills Associates (In re Forest Hills Associates)*, 40 B.R. 410, 11 B.C.D. 1145, 1147 (Bankr.S.D.N.Y.1984); *Midland Mutual Life Insurance Company v. Masnorth Corp. (In re Masnorth)*, 28 B.R. 892, 894 (Bankr.N.D.Ga.1983); 5 *Collier on Bankruptcy* ¶ 1124.03[2] at 1124–14 (15th ed. 1986). This is because "[t]he holder of a claim or interest who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain." S.Rep. No. 989, 95th Cong., 2d Sess. 120 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5906, *reprinted in,* Appendix 3 *Collier on Bankruptcy* (15th ed. 1985).

The intervention of bankruptcy and the defaults represent a temporary crisis which the plan of reorganization is intended to clear away.... Curing of the

default and the assumption of the debt in accordance with its terms is an important reorganization technique for dealing with a particular class of claims, especially secured claims.

*Id.* In discussing the meaning and effect of the concept of "cure" in the context of a Chapter 13 mortgage on a principal residence, the Second Circuit Court of Appeals in *In re Taddeo,* 685 F.2d at 29, concluded that "cure" means the same thing whether dealing with a Chapter 7, 11 or 13 case: "the event of default is remedied and the consequences are nullied. A state law to the contrary must fall before the Bankruptcy Code." *Id.*

The parties in the case before the court have agreed that the payment of arrearages consisting of the principal and the interest payments due for the months of February 1985 through January 1986 cured the defaults that "occurred before or after the commencement of the case," § 1124(2)(A), and reinstated the "maturity" of the original notes. § 1124(2)(B). In dispute, is the amount of damages required to compensate the creditors under § 1124(2)(C).[2]

### B. Compensation

■ The critical question is: Did Congress by enacting § 1124(2)(C), which provides that a claim is deemed unimpaired if the plan "compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law," intend to include as damages a payment of any amount of interest other than the interest which would be paid with the principal as part of the mortgage payment required by the original obligation, and if so, at what rate of interest and on what amount—the arrearage that had accumulated or the remaining unpaid principal?

The legislative history indicates that the damages provision of § 1124(2)(C) was not in the original House or Senate bills, but

was a compromise reflected in the House amendment. The only comment on its insertion is that:

[A] class of claims is not impaired under the circumstances of section 1124(2) if damages are paid to rectify reasonable reliance engaged in by the holder of a claim or interest arising from the prepetition breach of a contractual provision, such as an IPSO facto or bankruptcy clause, or law.

124 Cong.Rec. H 11103 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards), *reprinted in,* Appendix 3, *Collier on Bankruptcy, supra.* These comments are not particularly instructive for the resolution of the issues in this case. They appear to indicate that even though the curing of arrearages under § 1124(2)(A) applies to those defaults that occurred both before and after the commencement of the case, the awarding of damages under § 1124(2)(C) is limited to those defaults that occurred pre-petition: for cases so holding, *see In re Tavern Motor Inn, Inc.,* 56 B.R. 449, 452–54 (Bankr.D.Vt.1985); *In re Forest Hills Associates,* 40 B.R. 410, 11 B.C.D. at 1148. However, the "such as" provision is contradicted by the very language of § 1124(2)(A) and 11 U.S.C. § 365(b)(2) which excludes breaches occasioned by IPSO factor or bankruptcy clauses. The Code prohibits classifying non-payments under such contractual provisions as defaults for which a foreclosure remedy can be sought in a state court. Thus, a court must look elsewhere for the meaning of § 1124(2)(C).

What does appear clear is that Congress intended by the compromise addition of § 1124(2)(C) (which notably is missing from Chapter 13 cure provisions), to give something more than cure and reinstatement, while at the same time offering something less than full default privileges. *In re Rolling Green Country Club,* 26 B.R. 729, 733 (Bankr.D.Minn.1982). The difficulty is

---

**2.** The parties do not dispute the liability and amount of late charges and attorneys' fees as damages under § 1124(2)(C). Because the parties have agreed on these issues, the court need not consider them in this opinion. *In re Tavern Motor Inn, Inc.,* 56 B.R. 449, 453–54 (Bankr.D. Vt.1985).

determining how much more. One commentator has noted that § 1124(2)(C) "refers only to damages attributable to reasonable reliance on a right of acceleration. To qualify for compensation, a creditor presumably must show that he suffered damages from engaging in some course of conduct on the assumption that payment of the debt would be accelerated as a result of a default." Blum, *Treatment of Interest on Debtor Obligations in Reorganizations Under the Bankruptcy Code*, 50 U.Chi.L. Rev. 430, 437 (1983); *see also In re Kizzac Management Corporation*, 44 B.R. 496, 501 (Bankr.S.D.N.Y.1984). Damages would include actual expenses incurred by creditors pursuing their right to accelerate such as attorney's fees expended in a foreclosure action. *In re Rolling Green Country Club*, 26 B.R. at 733; *cf. Midland Mutual Life Insurance Company v. Masnorth Corp. (In re Masnorth Corp.)*, 36 B.R. 335, 338 (Bankr.N.D.Ga.1984) (denying attorney's fees in connection with relief from stay litigation as debtor was no longer entitled to rely on acceleration clause following bankruptcy under § 1124, although reasonable attorney's fees were allowed under 11 U.S.C. § 506(b) to oversecured creditor per the contract between the parties).[3]

■ Although courts vary on the amount and period for which damages are owed, most courts seem to follow the lead of *In re Rolling Green Country Club*, 26 B.R. at 733, in ordering "reimbursement for the out-of-pocket loss occasioned by the fact that the payments in default have been deferred," and in finding that "an appropriate interest allowance" adequately compensates for this loss. *Id.* This interest allowance, however, cannot be based on expected uses of the principal being denied the creditor as that would be too speculative. *Id.; see In re Manville Forest Products Corporation*, 43 B.R. 293, 11 C.B.C.2d 735, 746 (Bankr.S.D.N.Y.1984) (damages are

only for reliance on the existing contract, not lost opportunities); *In re Victory Construction Company*, 42 B.R. 145, 12 B.C.D. 349, 355 (Bankr.C.D.Cal.1984) (the lost opportunity to reinvest money is a cost the creditor must bear); *In re Rainbow Forest Apartments*, 33 B.R. 576, 578 (Bankr.N.D.Ga.1983) (the difference between the value of the accelerated principal reloaned at the current market rate versus the contract rate is not the type of loss contemplated by § 1124(2)(C) as compensatory damages).

Not only would it be too speculative to allow interest to be computed on expected uses of principal, but additionally to allow interest to be computed on the accelerated principal continues an integral component of the default provisions of the original contract and has the practical effect of negating the reinstatement and cure (based on deacceleration) intended by Congress. *In re Orlando Tennis World Development Co., Inc.*, 34 B.R. 558, 9 C.B.C.2d 816, 819 (Bankr.M.D.Fla.1983). *Accord Official Committee of Unsecured Creditors of Manville Forest Products Corporation v. Manville Forest Products Corporation (In re Manville Forest Products Corporation)*, 60 B.R. 403, 404 (S.D.N.Y.1986). *See In re Manville Products Corporation*, 43 B.R. 293, 11 C.B.C.2d 735, 742 (Bankr.S. D.N.Y.1984) (to permit acceleration would yield two payments of interest: one on confirmation at the accelerated amount and one under the terms of the deaccelerated reinstated contract); *In re Forest Hills Associates*, 40 B.R. 410, 11 B.C.D. at 1147 ("It follows logically that if there has been no default and acceleration, there can be no liability for interest on the accelerated debt.")

■ On the other hand, awarding interest on the accumulated unaccelerated contract mortgage payments which have become an arrearage, even though that ar-

---

**3.** (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the

holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11. U.S.C. 506(b).

rearage includes not only the unpaid principal payments but also the unpaid interest payments, is an appropriate way to compensate creditors for damages. *In re Manville Forest Products Corporation,* 60 B.R. at 404. *See also* Blum, *supra,* at 437: "It is not implausible to interpret the statute [§ 1124(2)(C)] as covering interest on an arrearage.... To ignore the value of a compound interest opportunity is to deny the creditor compensation for damages that go to the very essence of the investment." *Id.*

Having established that interest on arrearages, but not interest on unpaid principal, constitutes the type of compensation contemplated by the provisions of § 1124(2)(C) does not end the inquiry. Case law indicates that awarding interest on arrearages is complicated by four critical factors: (1) whether the status of the creditor's claim is oversecured or not, 11 U.S.C. § 506(b), *see e.g., In re Tavern Motor Inn, Inc.,* 56 B.R. at 452–54; *In re Forest Hills Associates,* 40 B.R. 410, 11 B.C.D. at 1148; (2) whether state law prohibits interest on interest, *see e.g., In re Kizzac Management Corporation,* 44 B.R. at 501–03; *In re Manville Forest Products Corporation,* 43 B.R. 293, 11 C.B.C.2d at 742–44, 747; *cf. In re Manville Products Corporation,* 60 B.R. at 404; (3) whether the default occurred pre-petition, post-petition or post-confirmation, *see e.g., In re Tavern Motor Inn, Inc.,* 56 B.R. at 452–54; *In re Forest Hills Associates,* 43 B.R. 293, 11 B.C.D. at 1148; and (4) whether the interest rate to be imposed should be at the rate established for the original payments under the contract, at the contract default rate, if any, or at the market rate, *see e.g., In re Orlando World Tennis Development Co., Inc.,* 34 B.R. 558, 9 C.B.C.2d at 819; *In re Masnorth,* 28 B.R. at 898; *In re Rolling Green Country Club,* 26 B.R. at 736.

█ Although none of the cases in the preceding paragraph involved precisely the same factual situation as is before the court, *i.e.,* a creditor whose default on an oversecured claim occurred pre-petition, post-petition and post-confirmation and the

underlying contract provided for varying interest rates throughout its term and a separate interest rate for payments in default, still there are some intersecting points that provide guidance for an appropriate interest award. First, compensation under § 1124(2)(C) must be in connection with reasonable reliance on the contractual right to accelerate; such a right ends once the bankruptcy petition is filed, since the order for relief prevents, among other actions, any pending foreclosure litigation. 11 U.S.C. § 362(a). Second, compensation under § 1124(2)(C) can consist of interest on the pre-petition arrearages. Third, where a creditor's claim is oversecured, interest may be granted on the entire claim (*i.e.,* whether pre-petition or post-petition) under § 506(b). In such an oversecured claim, the creditor may also receive "any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." *Id. See Vanston Committee v. Green,* 329 U.S. 156, 164, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946) (pre-existing case law now codified); *see also In re Bates,* 58 B.R. 915, 916 (Bankr.W.D.Tenn. 1986). The court concludes, that in the case of an oversecured creditor, 11 U.S.C. § 506(b), applicable to Chapter 11 cases (11 U.S.C. § 103(a)), provides a separate, independent basis for awarding interest in addition to other forms of compensation. If, however, the parties' contract did not provide for fees, costs or charges and those fees, costs or charges related to reasonable reliance on the lost right to accelerate, then damages may be obtained under § 1124(2)(C).

█ Accordingly, whether the court uses a § 1124(2)(C) or a § 506(b) analysis, interest could be awarded on the pre-petition default. Normally, a § 506(b) analysis involves only the pre-confirmation amount of the claim, *In re W.S. Sheppley & Co.,* 62 B.R. 271 (Bankr.N.D.1986). In this particular case, however, substantial consumation has not occurred, 11 U.S.C. § 1127, continuing jurisdiction in the bankruptcy court to resolve disputes was specifically granted in the plan and on the effective date of the

plan interest had not been determined by the court as called for in the plan; therefore, the amount of compensation is deemed to include post-confirmation defaults.

## C. Interest Rate

The final question then is at what rate shall interest be computed? Again, the cases are inconsistent, both in the context of interest under § 1124(2)(C) and under § 506(b). The Sixth Circuit Court of Appeals, although it has not addressed the issue of damages under § 1124, has addressed the issue of interest under cure and reinstatement provisions of a Chapter 13 plan and its relationship to § 506(b) in *Cardinal Federal Savings & Loan Association v. Colegrove (In re Colegrove)*, 771 F.2d 119 (6th Cir.1985).

While recognizing such significant differences as the fact that a Chapter 13 plan does not provide the voting opportunities granted to creditors in a Chapter 11 plan, and 11 U.S.C. § 1322(b)(2) is unique in providing that the rights of mortgage holders on the debtor's principal residence cannot be modified in a Chapter 13 case, nevertheless, there are similar threads that weave shared concepts in Chapters 11 and 13. One such example is the provision under 11 U.S.C. § 1322(b)(3), (5) for the curing or waiving of any default.[4] *See also In re Taddeo*, 685 F.2d at 27, for the proposition that the concept of "cure" used throughout the Bankruptcy Code is to repeal the contractual consequences of default. Although both Chapter 11 and Chapter 13 provide for curing a default, only Chapter 11 specifically provides for damages resulting from reliance on the default provisions in a contract. In spite of no express statutory authority for damages as such, Chapter 13 plans still must meet the confirmation standard with respect to each allowed secured claim that "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim." 11 U.S.C. § 1325(a)(5)(B)(ii). This provision contains concepts similar to those found in the confirmation standard set forth in 11 U.S.C. § 1129(a)(7)(B)[5] for impaired classes and 11 U.S.C. § 1124(3)[6] dealing with the value of

---

**4.** (b) Subject to subsections (a) and (c) of this section, the plan may—

    . . . .

    (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims;

    (3) provide for the curing or waiving of any default;

    . . . .

    (5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due;

11 U.S.C. § 1322(b).

**5.** (7) With respect to each impaired class of claims or interest—

    (A) each holder of a claim or interest of such class-

    (i) has accepted the plan; or

    (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of this title on such date; or

    (B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

11 U.S.C. § 1129(a)(7).

**6.** (3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to-

    (A) with respect to a claim, the allowed amount of such claim; or

    (B) with respect to an interest, if applicable, the greater of-

    (i) any fixed liquidation preference to which the terms of any security representing such interest entitle the holder of such interest; or

    (ii) any fixed price at which the debtor, under the terms of such security, may redeem such security from such holder.

11 U.S.C. § 1124(3).

unimpaired claims—in effect reiterating that an oversecured claim is entitled to interest, *etc.*, as provided in § 506(b).

The Sixth Circuit in *In re Colegrove*, 771 F.2d at 122, reasoned that § 1325(a)(5)(B)(ii) and § 506(b) when read with § 1322(b)(2) mandates that full present value of the amount owed is necessary to cure a default, and that where, as in the case before it, no provision for interest on late payments was provided for in the mortgage, the court was required to order that interest be paid to the holder of the oversecured claim. Even if a mortgage were to provide for a specific interest rate, the court indicated it would not find that controlling.

> We conclude that the most equitable rate to establish in this type of situation is the prevailing market rate of interest on similar types of secured loans at the time of allowance of the creditors claim and the confirmation of the plan in bankruptcy with a *maximum limitation* on such rate to be the underlying contract rate of interest.[4]

*Id.* at 123 (emphasis in original) (footnote 4. reads: "By limiting the interest rate to that found in the contract, we have struck a fair compromise between what has been agreed on by the parties, and what is dictated by simple economics. *See Thorne*, 34 B.R. [428] at 431.")

■ Returning now to the case before this court, the mortgage and notes indicate that the parties relied on fourteen percent (14%) of the remaining balance of the principal as the default rate. However, the case law indicates that damages cannot be based on the principal balance owing at the time of default since that would defeat the purpose of cure and reinstatement which is to deaccelerate the acceleration caused by the default and to negate its effects. The mortgage itself is silent regarding a rate of interest to be applied to the repayment of arrearages in the event of a bankruptcy. It provides only for varying interest rates on timely filed payments.

■ In order, therefore, to compensate the creditors of this long-term debt for damages incurred by reasonably relying on the contract's default terms, and to provide appropriate interest on their claims, the court follows the principle developed in *In re Colegrove* that equity demands that the present value of those delayed payments be recognized through the imposition of a market rate of interest. The court notes, however, that in the instant case, the parties bargained at arms-length and recognized fluctuating market rates on long-term debts by reflecting varying interest rates in their contract over its term, and further, that they mutually agreed in connection with this proceeding that, at a minimum, interest is ten percent (10%) per year on the total arrearages for payments of principal and interest owed for February-December 1985 and eleven percent (11%) per year for the January 1986 default.

Accordingly, the court orders that interest be computed using the market rate for long-term mortgages as of the due date of each late payment until the date paid, providing, however, if the market rate is below the ten percent (10%) or eleven percent (11%) stipulated minimum interest rate for the period in question, that interest be computed at the applicable ten percent (10%) or eleven percent (11%) agreed to by the parties in their contract, and if the market rate is higher than the default rate of fourteen percent (14%) agreed to by the parties in their contract, that the fourteen percent (14%) rate be used for computation.

In accordance with an agreed order entered April 8, 1986, all pre-confirmation defaults of principal and interest were to have been paid by April 17, 1986; and in accordance with the judgment entry dated January 26, 1986, all post-confirmation arrearages of principal and interest were to have been paid by January 23, 1986, in the form of adequate protection payments of thirty thousand dollars ($30,000) a month, and thereafter, all monthly payments were to be paid at the adequate protection rate of thirty thousand dollars ($30,000) a month. IT IS HEREBY ORDERED that all adequate protection payments are to cease with the payment for September 1986. IT IS FURTHER ORDERED that

the debtor may have credit against its adequate protection payments for interest on the arrearages at the market or otherwise applicable contract rate as set forth above, with the creditor refunding any excess payments. Arlington must pay Singer and Kling any interest remaining due by October 1, 1986. Singer and Kling must refund to Arlington any excess payments received by October 1, 1986.

An order consistent with this decision is entered simultaneously herewith.